Edward HAASE, Plaintiff,

v.

William H. WEBSTER, Director of the Federal Bureau of Investigation, et al., Defendants.

Civ. A. No. 85-0587.

United States District Court, District of Columbia.

May 14, 1985.

Michael Ratner, New York City, for plaintiff.

Edith S. Marshall, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

This is an action for injunctive and declaratory relief by a traveller returning from abroad to retrieve written matter seized in an allegedly illegal search made

of his luggage as he entered the country, and to require the government agencies making the search to refrain from similar adventures in the future.

Plaintiff Edward Haase is a broadcast engineer and freelance journalist from Kansas City, Missouri, who, in his latter capacity, possesses a special interest in issues relating to Nicaragua. Defendants are the Director of the Federal Bureau of Investigation ("FBI"), the Commissioner of the U.S. Customs Service ("Customs"), and various of their respective subordinates. The case is presently before the Court on defendants' motion to dismiss the case on mootness and standing grounds.[1] For the reasons set forth below, defendants' motion will be granted, and the complaint dismissed with prejudice.

### I.

From the several declarations and affirmations filed by the parties it appears to be undisputed that on January 16, 1985, Mr. Haase boarded a flight in Managua to return to the United States following a several months' stay in Nicaragua. Upon his arrival at Miami International Airport Haase presented at Customs where he was asked the expected routine questions, such as whether he had anything to declare and how long he had been out of the country. The Customs officer then circled certain information on Haase's declaration card, including the country visited, the length of his stay, and the fact that he was declaring books, magazines and newspapers acquired in Nicaragua, and directed him to a secondary inspection station where a second Customs official (later identified as a student-trainee) conducted a search of Haase's luggage. The official removed several books and magazines from Haase's bags, as well as a piece of paper bearing names and addresses which he discovered behind a picture frame, but being "uncertain" as to the "possible seditious nature" of the materials, he summoned a supervisory Customs inspector who, in turn, decided to contact the FBI for assistance in determining whether the materials might be unimportable under 19 U.S.C. § 1305(a).[2]

Shortly thereafter, Special Agent Jose Miranda of the FBI Miami Field Office arrived at the airport. (In the interim, the Customs official had photocopied the list of names and addresses found behind the picture frame. He turned the copy over to Miranda upon his arrival.) Haase was questioned briefly by Miranda who declared his intention to make his own search of Haase's luggage for subversive materials and then proceeded to do so, extracting Haase's personal address book, a diary, two articles he had written, five sheets of paper containing the names and addresses of organizations concerned with Nicaraguan and Central American affairs, still other papers having to do with the "National Network in Solidarity with the People of

---

**1.** The motion to dismiss having been supported, and opposed, by affidavit, the Court treats the motion as one for summary judgment of dismissal in accordance with Fed.R.Civ.P. 12(b).

**2.** 19 U.S.C. § 1305(a) provides, in pertinent part:

All persons are prohibited from importing into the United States from any foreign country any book, pamphlet, paper, writing, advertisement, circular, print, picture, or drawing containing any matter advocating or urging treason or insurrection against the United States, or forcible resistance to any law of the United States, or containing any threat to take the life of or inflict bodily harm upon any person in the United States....

Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the appropriate customs officer to await the judgment of the district court as hereinafter provided.... Upon the seizure of such book or matter such customs officer shall transmit information thereof to the United States attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that ... [it] is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed. Upon adjudication that such book or matter thus seized is not of ... [such] character, it shall not be excluded from entry under the provisions of this section.

Nicaragua,"[3] and certain additional books and magazines.

Anxious about missing a connecting flight, Haase requested and received permission to go to a different portion of the terminal to purchase a ticket, and while he was gone Special Agent Miranda, with the assistance of yet another Customs officer, photocopied the items he had removed from Haase's luggage. All the originals were then returned to Haase, and he departed for his ultimate destination, Special Agent Miranda retaining the photocopies at the Miami Field Office. A week or so later Haase's attorney contacted the FBI in an attempt to recover the copies but was unsuccessful, and this lawsuit followed on February 19, 1985.[4]

## II.

Plaintiff claims that defendants' treatment of him on January 16th violated his rights under the First, Fourth, Fifth and Ninth Amendments; that it was also illegal under the Privacy Act, 5 U.S.C. § 552a, and his common law right to privacy; and that defendants acted in excess of their statutory authority. He therefore prays for permanent injunctive relief in the form of an order requiring defendants to destroy or return to him all copies of materials seized; to expunge from the files of the FBI or any other government agencies any information obtained from them; to disclose to plaintiff the nature of any use made of or dissemination given the materials, or any information derived therefrom; and to prohibit any further dissemination, indexing or other use of such information hereafter. Plaintiff also seeks a declaratory adjudication that defendants' actions were in violation of plaintiff's constitutional rights; that FBI agents have no statutory authority to engage in "border searches" without prob-

able cause or a warrant; that 19 U.S.C. § 1305(a) is unconstitutional on its face and as defendants are applying it; and that defendants' "policy" of singling out individuals returning from Nicaragua for special questioning and searches is itself unconstitutional.

Defendants have moved to dismiss those of plaintiff's claims which look toward injunctive relief from the consequences of the January 16th seizure on the ground that they have become moot. Pursuant to the temporary restraining order entered at the outset of the case, they say, the only copies of the materials seized from Haase were located and sequestered. The supervisory special agent of the Miami Field Office averred in his initial declaration that no information derived from the papers had been disseminated or had made its way into any secondary data repositories by the time he delivered them as ordered on February 22nd to the Chief of the FBI's Civil Litigation Unit in Washington, D.C.

Plaintiff responded with affirmations of his lawyer and an "expert on F.B.I. record-keeping," pointing out what the supervisory special agent had *not* said (or could not say from personal knowledge) about the attention given the materials *before* he personally collected them. Defendants then filed declarations of *each* of the several special agents who had handled the documents following their seizure, attesting to the absence of any activity with respect to them while in their custody, and each of the Customs officers has similarly disavowed making any use of the documents other than to have turned them over to the FBI. Finally, the Assistant Director of the FBI who has had charge of them since they arrived in Washington asserts that upon receiving them he ordered that no use be

---

**3.** According to Haase, the organization (of which he is a member) is "a coalition of domestic religious, professional, human rights and solidarity groups that support the efforts of the Nicaraguan people to build a democratic society in their country."

**4.** On the date the complaint was filed the Court granted plaintiff's motion for a temporary re-

straining order, directing the FBI to assemble the documents seized and transmit them to the Director in whose custody they were to remain pending determination of plaintiff's application for a preliminary injunction. By consent of the parties the TRO has been extended from time to time, the last extension to remain in effect until the motion to dismiss has been decided.

made of them or any information they contain "unless authorized by order of the Court." In summary, therefore, the materials' chain of custody has been established under oath since they were first taken from Haase, and each of the custodians has sworn to have made no investigative use of them whatsoever; they have not been recopied, nor their content disseminated, indexed, filed, entered into computers or otherwise reduced to useable form as intelligence data.

The FBI now proposes that the documents themselves, i.e., the single extant set of photocopies in the possession of the Assistant Director, be deposited under seal in the Registry of the Court, there to remain, accessible to no one until they have been evaluated for archival purposes and an appropriate final disposition determined for them by the Court.[5] It also promises not to derive any information which it might from the documents nor permit anyone else to do so. It suggests that the entire undertaking be accomplished by a "stipulation" which will be approved by the Court. In short, the FBI offers to restore the *status quo ante* the January 16th seizure, or as much of it as it can, depriving itself of any intelligence benefit it might have acquired from the event.

Plaintiff is, however, unwilling to let the matter rest there. He still suspects the FBI of being disingenuous about the extent to which it has already made use of his papers, but the only proof he offers is his circumstantial evidence of a "secret policy" of collecting intelligence from and about people who visit Nicaragua, from which, he argues, it should be inferred that the FBI agents and Customs officers are lying to conceal it.

■ The Court finds from the evidence now before it that there is no genuine issue of material fact as to whether the FBI is prepared to disengage itself completely from the documents taken from Haase, including any information it might have gleaned from them. It has, in effect, offered to accede to all the equitable relief plaintiff could conceivably win by way of injunction for its past transgressions against him, and the law does not require that a wrongdoer make a formal confession of error or a public act of contrition.

■ Although a voluntary cessation of illegal conduct may not, by itself, render a suit to enjoin it moot, when there is no reasonable expectation of its causing further injury, and interim relief or events have completely and irrevocably eradicated its past effects, the parties have lost the legally cognizable interest in the outcome necessary to a "live" controversy. *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). Those circumstances seem to be present here, but even if the claims relating to the January 16th seizure are not technically moot, the absence of "some cognizable danger" of a resumption of the illegal activity, something "more than the mere possibility" of it, would require a discretionary denial of injunctive relief. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953).

■ The Court concludes that the FBI's offer to divest itself of Haase's documents, and to "stipulate" that it will continue to observe the Assistant Director's order prohibiting any use of their contents, subject to the Court's approval, affords sufficient assurance that plaintiff is not in need of further specific relief with respect to the seizure made on January 16th. It will, therefore, grant the motion to dismiss those claims relating to the seizure, conditioned, however, as would have been the proposed "stipulation."

### III.

Plaintiff also asks for prospective declaratory adjudications with respect to defendants' alleged practices, and the laws relied upon to justify them, to allay his anxiety

---

**5.** The FBI believes that it is without legal authority to give the documents to Haase directly prior to their review by an archivist. *See American Friends Service Committee v. Webster*, No. 79–1655 (D.D.C. August 27, 1981).

about trips he expects to make to Nicaragua in the future. He charges the existence of an agreement between the FBI and the Customs Service to collaborate in causing excessive border searches to be made of travellers from Nicaragua for general intelligence-gathering purposes, and he prays that it be declared unconstitutional. Defendants contend that plaintiff is without standing to maintain such claims for wrongs which may never be done him.

■ Article III of the Constitution limits the jurisdiction of the federal courts to actual "cases" and "controversies," and the doctrine of "standing" is one of several that have been developed to implement the constitutional limitation. *See Allen v. Wright*, —— U.S. ——, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, *reh'g denied*, —— U.S. ——, 105 S.Ct. 51, 52, 82 L.Ed.2d 942 (1984). It is now well-established that "at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant' ... and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976)). The injury or threat of injury, moreover, must be "real" and "immediate," not "conjectural" or "hypothetical," *Golden v. Zwickler*, 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969), a condition which is as necessary to justiciability whether the relief sought is an injunction or merely a declaratory judgment. *See* 28 U.S.C. § 2201; *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, *reh'g denied*, 300 U.S. 687, 57 S.Ct. 667, 81 L.Ed. 889 (1937).

In the past several years the Supreme Court has thrice reversed lower courts which, in particular circumstances, had found plaintiffs' subjective apprehensions of future governmental misconduct, originating entirely in their past exposures to it, sufficient to give them standing to sue for anticipatory relief. In *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), the Court declined to permit an action to be maintained against state judicial officers to enjoin their allegedly discriminatory administration of the criminal justice system in the absence of evidence of a sufficiently real and immediate threat of its recurrence. "Past exposure to illegal conduct" the Court said, "does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* at 495–96, 94 S.Ct. at 675–76. Shortly thereafter, in *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Court similarly disposed of a citizens' suit against a municipal mayor and police commissioner to compel them to take effective action to curb police brutality, holding that any attempt to predict what a "small, unnamed minority" of abusive police officers might do in the future because they had perceived past departmental discipline to be lax was even more speculative than the injustices the plaintiffs in *O'Shea* sought to avert, and "insufficient ... to warrant invocation of federal jurisdiction." *Id.* at 372, 96 S.Ct. at 605.

Most recently, in *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), a motorist, stopped by police officers for a minor traffic infraction and then subjected to use of a "chokehold" which rendered him unconscious and damaged his larynx, sued the officers and the city for damages, but he also sought injunctive and declaratory relief, alleging that city and police policy approved the use of chokeholds, even in situations posing no significant danger to arresting officers. The district court entered a preliminary injunction against use of such "control holds" unless death or serious injury were threatened, and the court of appeals af-

firmed, but the Supreme Court reversed, once again finding no justiciable case or controversy to be presented. While the plaintiff could surely proceed against the city for damages, he had not demonstrated—nor could he—the presence of "a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* at 105, 103 S.Ct. at 1667.

■ The lesson of *Lyons* and its predecessors is, simply, that federal jurisdiction does not extend to disputes which exist for the moment only in the mind of the plaintiffs. Applying that teaching to the instant case, the Court finds that Haase has not demonstrated that there is a substantial probability that he will ever again be subjected to such treatment as he received last January 16th. Accepting as true his assertion that he intends to return to Nicaragua in the near future to pursue his journalistic interests, and that he will once again be required on his return to submit to some sort of appropriate border search, unless he intends to provoke a confrontation for his own purposes, it would be a most unusual coincidence were he again to excite suspicion by carrying a list of names and addresses behind a picture frame,[6] or the

FBI would again be asked for its literary advice on the importability of items in his possession, in the course of which agents and/or Customs officials would once more find it necessary to seize and copy his personal papers.[7]

■ Plaintiff's anecdotal evidence purporting to demonstrate the existence of a "policy" of the Customs Service and the FBI of subjecting travellers returning from Nicaragua to intrusive searches and seizures for the purpose of gathering general intelligence is no more probative of the fact than was similar evidence in *Rizzo* probative of official condonation of police brutality. Hearsay reports of several other recent returnees from Nicaragua having had books and papers seized by Customs officials were presented to the Court in the affirmations of plaintiff's counsel, but even had the accounts been submitted with the requisite evidentiary formality, and their resemblance to the instant case were unmistakeable, the record would still not support a finding of the existence of an interagency conspiracy to engage in unlawful, probably unconstitutional, conduct on the scale which would be required to make it reasonably certain that what happened to Haase before would happen again. *See Rizzo v. Goode,* 423 U.S. at 372, 96 S.Ct. at 604.[8]

6. Although Haase maintains that the list inside the picture frame was not "secreted" there, but was merely scrap paper placed to secure the picture between the frame and the cardboard backing, it was not unreasonable for the Customs officer to suspect that it might have been purposefully concealed.

7. The Court has assumed throughout the case, although not now having to decide, that a warrantless border search by the FBI, and its seizure of innocuous personal property for general law enforcement purposes, is unlawful. *See United States v. Soto-Soto,* 598 F.2d 545 (9th Cir.1979). The Court also assumes, however, that it is not unlawful for the Customs Service alone to conduct proper entry inspections of travellers when they return from abroad. *United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977). Nor is it unlawful for any law enforcement agency to be specially observant of either travellers arriving from particular places or of particular

travellers. *See United States v. Vasquez,* 612 F.2d 1338 (2nd Cir.1979); *United States v. Klein,* 592 F.2d 909 (5th Cir.1979). That Haase finds himself "chilled" in the exercise of his First Amendment rights by such lawful activities does not enhance his standing to maintain this action. *See Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154, *reh'g denied,* 409 U.S. 901, 93 S.Ct. 94, 34 L.Ed.2d 165 (1972).

8. Other "evidence" offered by plaintiff to indicate the existence of the "policy" included his lawyer's account of a meeting between Miami District Customs Director Carnes and certain Miami residents at which Carnes is alleged to have said that literature from Nicaragua is being investigated because it may be critical of U.S. policy. He also submitted press clippings describing the testimony given by FBI Director Webster at a recent House subcommittee hearing concerning contacts made with returnees from Nicaragua by FBI agents at non-border locations subsequent to their return home.

**1234**

At this point plaintiff clearly has no standing to vindicate the rights of any other travellers to Nicaragua but himself, *see, e.g., Valley Forge Christian College v. Americans United*, 454 U.S. at 474, 102 S.Ct. at 758; *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), and although Haase urges that he should be permitted to engage in discovery in an attempt to uncover additional evidence to confirm his suspicions, the allegations are altogether too phantasmal to warrant discovery of the magnitude which would be necessary to bring such a covert "policy" to light. If such an inquiry is to be made, Congress must do it. *See Laird v. Tatum*, 408 U.S. at 14–15, 92 S.Ct. at 2326–2327.

In the absence of any substantial showing of an actual present or immediately threatened injury to Haase himself—amounting to more than his mere discomfiture at being selected for some special scrutiny when he returns from Nicaragua in the future—the Court concludes he is without standing to seek any more relief than defendants have already agreed to afford him. It is, therefore, for the foregoing reasons, this 14th day of May, 1985,

ORDERED, that defendants' motion to dismiss is granted; and it is

FURTHER ORDERED, that, upon condition defendants deposit the copies of all documents seized from plaintiff on January 16, 1985, under seal in the Registry of this Court within 10 days, and make no use of any information derived therefrom hereafter, the complaint shall stand dismissed with prejudice.