Edward HAASE, Appellant

v.

William S. SESSIONS, Director, F.B.I., et al.

No. 85–5816.

United States Court of Appeals, District of Columbia Circuit.

Dec. 15, 1987.

David D. Cole and Michael Ratner, were on appellant's petition for rehearing.

Before WALD, Chief Judge, BUCKLEY, Circuit Judge, and EDWARD D. RE,* Chief Judge, United States Court of International Trade.

ON PETITION FOR REHEARING

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Pursuant to a petition for rehearing, we vacate section III.B. of *Haase v. Webster*, 807 F.2d 208 (D.C.Cir.1986) ("*Haase II*"). Appellant, a journalist returning from Nicaragua, alleges that the FBI and the U.S. Customs Service searched his luggage at customs as part of an official, and unlawful, policy of the United States to collect information from visitors to Nicaragua, and perhaps other countries, suspected of carrying political items of interest to the government. Appellant seeks a declaratory judgment that this policy violates statutory law and the Constitution. The district court dismissed this claim for want of standing. We remanded, holding that the record evidence did not support summary judgment, but that the government must be afforded the opportunity to demonstrate by affidavit or otherwise that no such poli-

cy exists, in which case a denial of standing would be appropriate.

Upon reflection we find that the district court improperly converted the government's motion to dismiss into a motion for summary judgment by operation of Rule 12(b). *See Haase v. Webster*, 608 F.Supp. 1227, 1229 n. 1 (D.D.C. 1985) ("*Haase I*"). This procedural error, which we followed, *Haase II*, 807 F.2d at 216, but now correct, leads to a new outcome.

In explaining our present conclusion, we find it necessary to survey a surprisingly uncharted terrain involving the application of Rules 12(b) and 56 of the Federal Rules of Civil Procedure to standing doctrine and the attendant distinction between a motion to dismiss for want of standing and motion for summary judgment for want of standing. We summarize our findings at the outset.

We find that appellant Haase has failed to plead sufficient facts to warrant standing for declaratory relief. Pursuant to this remand, Haase will have the opportunity to plead additional facts. There are three possible outcomes. If the *pleadings* are still insufficient, the complaint must be dismissed for want of standing. If the district court is uncertain as to the sufficiency of the pleadings, it can order evidentiary hearings on its own motion and then rule on the standing question. If the pleadings meet the requirements of Article III standing, the court has proper jurisdiction.

Notwithstanding this latter finding, the government retains the opportunity, at its option, to challenge the *evidentiary basis* of the pleadings. It does so by filing a motion for summary judgment for want of standing. In this procedural posture, discovery by either party is appropriate, though it is necessarily limited by whatever defenses and privileges the government-defendant can properly assert. Pursuant to Supreme Court instruction and a recent decision in this circuit, the principal consequence in terms of standing law is that the plaintiff must show injury with greater specificity due to the expansion of the record evidence. *United States v. SCRAP*,

*Sitting by designation pursuant to 28 U.S.C. § 293(a).

412 U.S. 669, 689–90 n. 15, 93 S.Ct. 2405, 2417 n. 15, 37 L.Ed.2d 254 (1973); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 1927–28 n. 25, 48 L.Ed.2d 450 (1976); *Wilderness Soc'y v. Griles*, 824 F.2d 4 (D.C.Cir.1987). The task then falls to the district court to evaluate the standing claim based on evidentiary findings, rather than pleading allegations.

These procedures apply as a general matter to all standing cases, as a defendant's challenge to a plaintiff's standing can take two forms: a motion to dismiss, which is based exclusively on plaintiff's pleadings, and a motion for summary judgment, in which evidence, not pleadings, pertinent to standing are evaluated by the district court. In both instances, disputed facts must be construed in the light most favorable to plaintiff. In addition to these two party-initiated motions, the court on its own initiative may undertake evidentiary hearings, even in the context of a motion to dismiss. This is so because the ultimate responsibility to ensure subject matter jurisdiction always lies with the court, not the parties.

In sum, we conclude that the Federal Rules of Civil Procedure apply to issues of standing. In reaching this conclusion in the instant case, we are required to set forth our understanding of Supreme Court case law as it relates to the requirements of standing when plaintiffs seek declaratory relief. We conclude that appellant's complaint does not suffer the defects identified in the leading case of *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), as explained in Part II.B. of this opinion.

## I. BACKGROUND

Edward Haase is a freelance journalist who has been actively critical of United States policy toward Nicaragua. On January 16, 1985, Haase returned from one of several trips to that country. When he arrived at Miami International Airport, Haase was asked a number of routine questions by a customs inspector who circled certain information on his declaration card (including the country visited and the fact that he was declaring reading material acquired in Nicaragua) and directed him to a second inspection station. There, another customs inspector searched Haase's bags and removed several books and magazines. The second inspector conferred with his supervisor, who called in an FBI agent to help determine whether these materials might be excludable under 19 U.S.C. § 1305(a) (1982). Section 1305(a) prohibits the importation, *inter alia*, of books and pamphlets "advocating or urging ... forcible resistance to any law of the United States, or containing any threat to take the life of or inflict bodily harm upon any person in the United States...."

Sometime prior to the agent's arrival, the second customs inspector found a list of names and addresses that appeared to have been hidden behind a picture frame. He photocopied this list and gave the copy to the FBI agent when he arrived. The agent then questioned Haase, searched his luggage for subversive material, and removed and photocopied a number of items, including magazines, a diary, and a five-page list setting forth the names, addresses, and telephone numbers of organizations and individuals concerned about Central American affairs. All the originals were returned to Haase, who was then permitted to pass through customs.

On February 19, 1985, Haase brought an action in district court, claiming that the conduct of the FBI and customs agents had violated his rights under the first, fourth, fifth, and ninth amendments, infringed his right to privacy, and was ultra vires the agents' statutory authority. Haase sought two forms of relief. First, he asked for an injunction requiring the government to return or destroy all copies of his papers, to list all those who saw the documents, and to describe all use made by the FBI of the copies. Second, Haase sought a declaration that the seizure and reproduction of his papers violated his constitutional and statutory rights.

On March 26, 1985, the government moved for dismissal of Haase's complaint pursuant to Fed.R.Civ.P. 12(b). The government's motion asserted that Haase's

complaint was moot insofar as it sought injunctive relief, and that Haase was without standing to seek declaratory relief. In support of its mootness claim, the government stated that it was prepared to place all copies of Haase's papers under seal in the registry of the district court and introduced a series of affidavits to establish that the papers had not been disseminated or further reproduced.

On April 18, 1985, Haase filed an amended complaint which alleged for the first time that the January 16 incident was the product of a policy of subjecting travelers returning from Nicaragua to intrusive border searches for intelligence-gathering purposes. Haase supported this allegation with the following material: (1) an affidavit of his attorney that recounted the experiences of other travelers who claimed they had been subjected to intrusive border searches upon returning from Nicaragua; (2) a number of newspaper articles that described similar searches; and (3) an affidavit in which he explained his plans to return to Nicaragua, and the chilling effect that his fear of future border searches would have on his journalistic activities.

The district court ruled on the government's motion to dismiss on May 14, 1985. *See Haase I.* Noting that the motion had been supported and opposed by affidavit, the court stated that, pursuant to Fed.R. Civ.P. 12(b), it would treat the motion as one for summary judgment. 608 F.Supp. at 1229 n. 1. The court dismissed as moot Haase's request for injunctive relief, a holding we affirmed in *Haase II*, 807 F.2d at 212–13, and do not now disturb.

The district court then considered whether Haase had standing to seek declaratory relief. Relying principally on *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the court ruled that Haase's request for prospective relief did not rise to the level of a case or controversy under Article III of the Constitution because he had not demonstrated a sufficient probability that he would be subjected to another search like that of January 16. The court rejected Haase's allegation of an official policy of harassing travelers re-

turning from Nicaragua as "altogether too phantasmal to warrant discovery of the magnitude which would be necessary to bring such a covert 'policy' to light." *Haase I,* 608 F.Supp. at 1234. Accordingly, the court dismissed Haase's request for declaratory relief for want of standing.

Haase appealed to this court. We issued our initial decision on December 9, 1986, holding that the record evidence did not support summary judgment, but that the government must be afforded an opportunity to demonstrate by affidavit or otherwise that no policy of harassment exists, in which case a denial of standing would be appropriate. Shortly thereafter, on January 23, 1987, Haase filed the petition for rehearing that prompted our present reconsideration, arguing principally that *Haase II* erroneously requires the district court to resolve issues of fact at the summary judgment stage of the proceeding.

## II. DISCUSSION

### A. *Standing and the Federal Rules*

#### 1. Analysis

Under the Federal Rules of Civil Procedure, when a party files a motion to dismiss for failure to state a claim, the district court is instructed to treat the motion as one for summary judgment if either party submits additional materials "outside the pleadings." Fed.R.Civ.P. 12(b). In this case, the government filed a motion to dismiss Haase's complaint for want of standing. In opposing the motion, Haase included material "outside the pleadings." As a consequence, the conversion feature of Rule 12(b)(6) was applied, and the government's motion was thereafter treated as one for summary judgment.

It seems clear, however, that the plain language of Rule 12(b) permits *only* a 12(b)(6) motion to be converted into a motion for summary judgment. The last sentence of Rule 12(b), by requiring "a motion asserting the defense numbered (6)" to be treated as one for summary judgment if extra-pleading material is introduced, precludes by negative implication the possibili-

ty that motions filed under 12(b)(1)–(5) or (7) may be so treated.

In the instant case, while both the government and the district court treated the motion to dismiss as filed pursuant to Rule 12(b), neither undertook to identify the applicable subsection. Apparently, the district court assumed the government's motion to be a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. Upon reviewing the government's motion to dismiss, however, we find that it unambiguously sought dismissal of Haase's complaint pursuant to Rule 12(b)(1). The motion expressly and exclusively states that the defect presented by Haase is want of standing. As applied to the categories supplied by the rules, the defect of standing is a defect in subject matter jurisdiction. *See, e.g., Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) (classifying lack of standing as a defect in the court's subject matter jurisdiction). As the applicable subsection is therefore 12(b)(1), not 12(b)(6), the conversion feature does not apply, and the case procedurally should have been limited, at least absent a sua sponte directive from the court or a summary judgment filing from the government, to a review of Haase's allegations, and supporting materials, if submitted.

The distinctions between 12(b)(1) and 12(b)(6) are important and well understood. Rule 12(b)(1) presents a threshold challenge to the court's jurisdiction, whereas 12(b)(6) presents a ruling on the merits with res judicata effect. *See, e.g., Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1130–31 (2d Cir.1976). As described by the Advisory Committee, "Rule 12(b)(6) ... is substantially the same as the old demurrer for failure of a pleading to state a cause of action." Fed.R.Civ. P. 12(b) 1946 advisory committee's note. In 12(b)(1) proceedings, it has been long accepted that the judiciary may make "appropriate inquiry" beyond the pleadings to "satisfy itself on authority to entertain the case." *Gordon v. National Youth Work Alliance*, 675 F.2d 356, 362–63 (D.C.Cir. 1982) (citations omitted); *see, e.g., Land v.*

*Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion, ... the court may inquire, by affidavits or otherwise, into the facts as they exist." (citations omitted)). This general rule has been made very specific as to standing controversies presented on a motion to dismiss:

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. *E.g., Jenkins v. McKeithen*, 395 U.S. 411, 421–422 [89 S.Ct. 1843, 1849, 23 L.Ed.2d 404] (1969). At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

*Warth v. Seldin*, 422 U.S. 490, 501–02, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975). *See also Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981) (citing cases).

By contrast, the conversion feature of Rule 12(b)(6) was added in 1948 for a very different purpose. Previously, parties were unable to assert through evidence that the allegations presented no meritorious claim. The amended feature acknowledged that this artificial bar to an evidentiary challenge made no sense. *See, e.g., Exchange Nat'l Bank*, 544 F.2d at 1131. In addition, judicial economy warranted giving such motions preclusive effect. Recognizing the distinctive operation of the two rules, this court put the matter simply: "the impropriety of transforming Rule 12(b)(1) motions into summary-judgment motions is well-settled." *Gordon*, 675 F.2d at 363 n. 18 (citing cases).

The absence of the conversion feature in 12(b)(1) *does not* preclude a defendant from challenging standing via a motion for sum-

mary judgment. This point is expressly affirmed in *SCRAP,* where the Supreme Court, though in dicta, stated the unexceptional proposition that a party was free to seek summary judgment for want of standing when it believed an allegation to be a "sham" and therefore not capable of proof. 412 U.S. at 689, 93 S.Ct. at 2417 ("If, as the railroads now assert, these allegations were in fact untrue, then the appellants should have moved for summary judgment on the standing issue and demonstrated to the District Court that the allegations were sham and raised no genuine issue of fact." (footnote omitted)). *See also Wilderness Soc'y,* 824 F.2d at 16–17.

We now apply these procedural principles to the specifics of standing. As a general matter, a plaintiff's standing to pursue a claim rests on the theory of injury presented in the complaint and the facts alleged in support of the claim. If the claim is logically defective in some manner, the court is obliged to dismiss the action and to do so no matter when the defect is brought to the court's attention. To the extent the assessment turns on factual evidence, the court may consider all matters developed in the record at the time of its decision. At this stage, however, the plaintiff is protected from an evidentiary attack on his asserted theory by the defendant, just as the defendant is protected from compulsory discovery. This is the meaning of the many Supreme Court decisions emphasizing that the standing inquiry turns on the allegations in the complaint. *See, e.g., Warth,* 422 U.S. at 500–01, 95 S.Ct. at 2206. Directed discovery cannot be allowed when the focus is on the logical sufficiency of the complaint. The plaintiff is the beneficiary of this rule as he can freely augment his pleadings with affidavits, while the defendant is barred *at this stage of the proceedings* from attacking the claims made therein. Assuming the theory presented in the complaint is not itself inherently flawed, the standing inquiry is ordinarily now complete.

Article III courts have one additional and essential protection against unmeritorious standing claims. The option remains with the defendant and, in any event, with the

court to test the asserted theory of injury, causation, and redressability at the factual, evidentiary level. The defendant can force this inquiry by filing a motion for summary judgment for want of standing. Alternatively, the court can initiate this factual inquiry at the motion to dismiss stage. In this latter case, the court will then explicitly base its standing decision on its assessment of the facts. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 67–68, 72, 98 S.Ct. 2620, 2627, 2630, 57 L.Ed.2d 595 (1978) (district court held four days of hearings to decide motion to dismiss for want of standing). *See also Carolina Envtl. Study Group, Inc. v. United States Atomic Energy Comm'n,* 431 F.Supp. 203, 205 (W.D.N.C.1977) (extensive discovery by parties pursuant to court-established discovery schedule). The fact-finding of the court to support or deny standing is subject to review under the clearly erroneous standard. *See Duke Power,* 438 U.S. at 77, 98 S.Ct. at 2632 ("[W]e cannot say we are left with 'the definite and firm conviction that' the finding by the trial court ... is clearly erroneous; and, hence, we are bound to accept it." (citation omitted)).

Once the inquiry moves into this latter, fact-based stage, discovery by the parties must be allowed subject to whatever defenses and privileges a party can properly assert in response to the discovery process.

Our recent decision in *Wilderness Society v. Griles,* 824 F.2d 4 (D.C.Cir.1987), is consistent with this analysis of the proper procedure for consideration of standing. *Wilderness Society* holds that reciprocal discovery may be required for motions for summary judgment for lack of standing. 824 F.2d at 17. *Wilderness Society* also recognizes, in dictum, that a district court considering a motion under 12(b)(1) to dismiss for lack of subject matter jurisdiction may consider "appropriate extra-pleading materials." *Id.* at 17 n. 10. We note, however, that only a *court* may take additional evidence to assure itself of the existence of standing.

█ A plaintiff has no *right* to discovery in opposing a motion under 12(b)(1). Any suggestion to the contrary derived from *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir.1981), *cited in Wilderness Soc'y*, 824 F.2d at 16 n. 10, must be rejected. *Williamson* spoke of subject matter jurisdiction in general, not standing in particular. Moreover, *Williamson* involved the district court's resolution of disputed factual issues. 645 F.2d at 413. A motion to dismiss under 12(b)(1) for lack of standing, by contrast, involves an examination of the face of the complaint, which does not depend upon discovery.

In considering standing under 12(b)(1), only the court, not the plaintiff (or defendant), can elicit information outside the pleadings. This permits the court to undertake an independent investigation to assure itself of its own subject matter jurisdiction. At the same time, it protects both plaintiff and defendant from burdensome and unnecessary discovery at a premature stage of the proceedings.

### 2. Application to the Present Case

█ Applying this framework to *Haase* yields the following result. The government's motion to dismiss challenged the logical adequacy of Haase's complaint. As discussed in Part II.B., we find that Haase's complaint may avoid the logical defects besetting the plaintiffs in *Lyons*, *Rizzo* [423 U.S. 362, 96 S.Ct. 598, 46 L.Ed. 2d 561 (1976)], and *O'Shea* [414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)]. Indeed, if Haase were simply seeking damages for the harm done him in the incident, he surely would have standing. Haase, however, seeks broad, sweeping declaratory relief; and it is for this reason that his allegations, even on their face, fall somewhat short. *See Allen v. Wright*, 468 U.S. 737, 760–61, 104 S.Ct. 3315, 3329, 82 L.Ed.2d 556 (1984) ("Case-or-controversy considerations ... 'obviously shade into those determining whether the complaint states a sound basis for equitable relief.' The latter set of considerations should therefore inform our judgment about whether respondents have standing." (internal citation omitted)).

We find the present complaint and supporting materials deficient for purposes of standing. The deficiency relates to the quantum of proof, rather than to an inherent logical flaw. As we observed in *Haase II*, "the critical issue in this case [for purposes of the standing inquiry] is ... Haase's allegation that he was the victim of a government policy of subjecting travelers returning from Nicaragua to intrusive border searches for intelligence-gathering purposes." 807 F.2d at 213.

Haase's allegations and supporting submissions pleading a policy of intelligence-gathering border searches are exceedingly weak. Aside from incidents of Haase's own search, the allegations consist of hearsay reports by Haase's attorney about three ostensibly similar incidents, the hearsay remarks by an FBI District Director at a meeting, and the testimony of then-FBI Director Webster that the agency had interviewed 100 visitors to Nicaragua at non-border locations at the express direction of intelligence authorities.

None of these allegations perceptibly advances Haase's claim. Haase's attorney Ratner has not provided the affidavits of the alleged victims, but merely recounts a conversation with one returning traveler and reports similar incidents involving two others. Given the sweeping scope of the asserted policy, it is critical that the allegations of similar incidents be presented in detail. Much of Haase's own credibility turns on the precise recounting of events (*i.e.*, the custom official's highlighting his lengthy stay, identifying him as a journalist, the forced switch in custom lines, the timing in calling for the FBI, etc.). If other complaints showed a similar pattern involving different officers, at different times and at different places, the allegations would at least be sufficient to present an issue for the district court to evaluate.

FBI District Director Harry Carnes' statements that the seized literature is "critical of U.S. policy" and is "intended to change minds of the United States [sic]," and that the literature claims that the "U.S. [is] ruining Nicaragua," are hearsay remarks which, standing alone, have at

best a questionable bearing on the existence of an official U.S. border search policy. Third Affirmation of Ratner at para. 15; J.A. at 124.

Director Webster's testimony, presented in Senate hearings, is immaterial. He refers to home interviews, not border searches. The interviews respond to counter-intelligence requests. Political harassment is specifically denied. Webster's statement does not indicate, nor is any evidence put forward to suggest, that the interviews included searches and seizures of political material transported from Nicaragua or elsewhere.

The probative evidence alleged by Haase thus turns on his actual January 16, 1985 search and two subsequent conversations between FBI agent Philip and Haase's attorney, Ratner, as reported by Ratner.

According to Ratner, Philip told him that the FBI was interested in Haase's address book because it contained the names and addresses of people in Nicaragua and the United States. First Affirmation of Ratner at para. 4; J.A. at 20–21. Philip also reportedly said that the FBI has an obligation to protect the United States and that there are problems with Nicaragua, Cuba, Libya, and Iran. *Id.* at para. 6; J.A. at 21. In a later conversation, Philip also told Ratner that the FBI is interested in particular listed organizations. *Id.* at para. 10; J.A. at 21. Ratner avers in addition that Philip told him that "after all he (Haase) was coming back from Nicaragua." Third Affirmation of Ratner at para. 4; J.A. at 120.

Ratner's report of Philip's comment raises a possible suspicion about the FBI's involvement in the customs search. In addition, Oliveros, the second customs official to inspect Haase's luggage, stated that he called in his supervisor because of the possibly seditious nature of some of the written materials. Decl. of Oliveros at para. 6; J.A. at 109. Korzeniowski, the supervisor, confirmed that this is why he was summoned, and that it was the possibly seditious nature of the materials that led him in turn to call in the FBI. Decl. of Korzeniowski at para. 6; J.A. at 112. Yet FBI

agent Miranda, who came and copied the materials, stated that he did so because he "believed the documents related to a pending investigation on ... Philip's squad." Decl. of Miranda at para. 4; J.A. at 94. Philip confirms that Miranda copied the materials for this reason. Suppl.Decl. of Philip at para. 3; J.A. at 90. No evidence discloses what this "investigation" was about. It may be that the FBI's interest indeed related to this undisclosed investigation, which would support the FBI's contention that it was not interested in the materials because of their seditious nature. On the other hand, at least some question is raised when a customs official seeks FBI assistance for a possible violation of section 1305, which states in pertinent part:

> (a) All persons are prohibited from importing into the United States from any foreign country any book, pamphlet, paper, writing, advertisement, circular, print, picture, or drawing containing any matter advocating or urging treason or insurrection against the United States, or forcible resistance to any law of the United States, or containing any threat to take the life of or inflict bodily harm upon any person in the United States....

19 U.S.C. § 1305 (1982).

Oliveros also stated that after the FBI had already been called (due to the possibly seditious nature of the materials), he "made a copy of a list of names and addresses which I had discovered secreted between a framed picture and a cardboard backing in Mr. Haase's baggage." Decl. of Oliveros at paras. 6 and 7; J.A. at 109. Severine, the FBI agent who was initially called by Customs and who in turn called in Miranda, stated that the complaint clerk in the Miami FBI office who received the call from Customs told him that Haase had been searched by Customs and that he "had in his possession papers which had been placed behind pictures in picture frames." Decl. of Severine at para. 3; J.A. at 103–04. This statement that the FBI was called in because of the allegedly furtive secreting of papers is at least presumptively inconsistent with Oliveros' statement that he made the list from those

secreted papers *after* the FBI was called. Perhaps Oliveros discovered the hidden papers first, then the FBI was called in, and then Oliveros made the list; but the more natural reading of Oliveros' affidavit is that he discovered the hidden papers only after the FBI was called in.

The Supreme Court in *Lyons* expressly acknowledged that standing requirements vary depending on the nature of the relief sought. *Lyons,* 461 U.S. at 106 n. 7, 103 S.Ct. at 1667–68 n. 7; *see also Rizzo v. Goode,* 423 U.S. 362, 383, 96 S.Ct. 598, 610, 46 L.Ed.2d 561 (1976) (Blackmun, J., dissenting) (recognizing that "some constitutional violations might be spread so extremely thin as to prevent any individual from showing the requisite case or controversy"). Given the nature of Haase's claim—a pervasive government policy of searching returning visitors for political intelligence—it is surprising, at the least, that more people have not come forward if in fact such a broadly intrusive practice exists.

In *Lyons,* where standing was denied, there were allegations of fifteen chokehold-related deaths. *Lyons,* 461 U.S. at 100, 103 S.Ct. at 1664. Here, by contrast, we have but one incident, ambiguous and partial statements from some of the participants, and three undocumented allegations of similar searches elsewhere. Despite an exhaustive examination of Haase's complaint and supplementary submissions, we can find nothing in the record that plausibly supports the existence of the challenged policy, even "accept[ing] as true all material allegations of the complaint." *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206. Based solely on this record, the district court was entirely correct to find that Haase's allegation of an official policy of harassing travelers returning from Nicaragua was "altogether too phantasmal to warrant discovery of the magnitude which would be necessary to bring such a covert 'policy' to light." 608 F.Supp. at 1234.

On remand, if the record, in the judgment of the district court, remains similarly deficient, Haase's complaint must be dismissed. We underscore that, at the plead-ing stage of the standing inquiry, the government cannot challenge any of the affidavits or other material that Haase might introduce, nor, in return, can Haase conduct discovery against the government. Likewise, the district court must assess the evidence with only one question in mind: Does the record support standing pursuant to the constitutional requirements of injury, causation, and redressability? The court cannot weigh the evidence to decide whether the policy in fact exists.

If Haase passes the initial pleading hurdle on standing, either the government or the court can then initiate the factual inquiry. If the court, for example, continues to doubt the actual existence of the policy, it can open the door on discovery on this limited issue. In essence, the court would follow the procedure outlined in *Haase II,* with one exception. We decline at this stage in the proceeding as an appellate court to protect the government from discovery. *See Haase II,* 807 F.2d at 216–17. The government itself must assert whatever defenses and privileges it feels entitled to claim, and it is for the district court to rule on these claims in the first instance. The district court retains complete control over the discovery process to ensure that Haase's search is carefully circumscribed "given the extremely sensitive subject matter of this case." *Id.* at 216. At the end of this process, that court will be forced to weigh the factual evidence and decide if, as a matter of law, Haase does or does not have standing.

In the alternative, the government can compel the factual inquiry by filing a summary judgment motion for want of standing, backed by affidavits or other evidence showing that no intelligence-gathering border policy exists. Rule 56 standards govern, whereas a court-initiated fact-finding is governed by the standards applicable to a motion to dismiss and subject to review under the clearly erroneous standard.

B. *Standing to Seek Declaratory Relief*

If Haase establishes the existence of the policy, he will have standing to seek declaratory relief if he can show that he is "real-

istically threatened by a repetition of his experience." *Lyons,* 461 U.S. at 109, 103 S.Ct. at 1669.

*Lyons* held that a plaintiff who had been subjected to an allegedly unlawful chokehold lacked standing to seek an injunction against the police department's use of chokeholds. Lyons' standing depended on his ability to show a likelihood of *future* harm. 461 U.S. at 105, 103 S.Ct. at 1667. Lyons, however, could not prove he would be stopped by the police again, and if stopped, subjected to an illegal chokehold. *Id.* at 105, 103 S.Ct. at 1667.

In *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), plaintiffs sought an injunction against various claimed unconstitutional practices of the Philadelphia police department. The Court held that the plaintiffs had not established standing; no injury was made out by allegations concerning "what one of a small, unnamed minority of policemen might do to them in the future because of that known policeman's perception of departmental disciplinary procedures." 423 U.S. at 372, 96 S.Ct. at 605.

Finally, *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), held that plaintiffs who sought to enjoin allegedly unconstitutional practices of state judges lacked standing. There was no evidence that the named plaintiffs would again be subject to the practices complained of. The claimed future injury— that plaintiffs might violate the law, might be charged, might be tried before the defendants, and might be subjected again to discriminatory practices—was speculative and conjectural. 414 U.S. at 497, 94 S.Ct. at 676.

Although *Lyons* and its predecessors involved injunctive relief, whereas Haase seeks declaratory relief, we do not distinguish *Lyons* on this basis. Lyons did not have standing because he failed to establish a sufficient likelihood of future injury. 461 U.S. at 105, 103 S.Ct. at 1667. This conclusion, premised on the injury requirement of Article III, would not be affected by the *form* of relief requested. *Lyons* cites cases dealing both with injunctive and

with declaratory relief. 461 U.S. at 102–05, 103 S.Ct. at 1665–67. For example, the Court found *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), which dealt with standing to seek a declaratory judgment, "directly apposite." 461 U.S. at 104, 103 S.Ct. at 1666.

*Lyons, Rizzo,* and *O'Shea* define the threshold test that Haase must meet. A common thread binds these cases: more than a nebulous assertion of the existence of a "policy" is required to establish standing. The plaintiffs must not only demonstrate its existence but also that they are likely to be subjected to the policy again. Here, Haase may be able to satisfy this requirement. If he proves that the policy exists, that he is likely to travel again to Nicaragua, and that he is likely to be subjected to the policy upon his return, then the threat of repetition will be established.

Finally, the threat of repetition must be sufficiently "real and immediate," *Golden,* 394 U.S. at 109, 89 S.Ct. at 960, to meet Article III's injury requirement. Otherwise stated, the threat must be "realistic[ ]." *Lyons,* 461 U.S. at 109, 103 S.Ct. at 1669. Although *Golden's* immediacy requirement is partly related to the *likelihood* of future injury (*cf. Lyons,* 461 U.S. at 104, 103 S.Ct. at 1666), it is also a *temporal* limitation. Zwickler's vague claim that the former Congressman might be a candidate again sometime in the future, 394 U.S. at 109, 89 S.Ct. at 960, was too remote and speculative to establish standing. Similarly, it will not do for Haase to assert generally that he might one day return to Nicaragua. More immediate and concrete plans are necessary.

### III. CONCLUSION

If the government had moved for summary judgment, the remand order described in *Haase II* would have been and remains proper, excluding the limitation on discovery. Specifically, the government, upon motion for summary judgment, can introduce evidence undermining Haase's claim that a government policy exists to gather intelligence at the border from incoming travelers. As noted, however, the

case presently rests in the posture of a motion to dismiss. On remand, the parties must pick up the litigation at this point consistent with our instructions.

*So ordered.*