CENTRAL SOYA COMPANY, INC.,
Plaintiff-Appellee,

v.

CONSOLIDATED RAIL CORPORATION,
Defendant-Appellant.*

No. 79–1505.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 8, 1979.

Decided March 21, 1980.

---

* Editor's Note: The opinion of the United States Court of Appeals, Ninth Circuit in *Marshall v. Provision House Workers Union, Local 274, Amalgamated Meat Cutter and Butcher Workmen of North America, AFL–CIO*, published in the advance sheets at this citation (614 F.2d 684), was withdrawn from the bound volume because rehearing is pending.

Charles N. Marshall, Philadelphia, Pa., for defendant-appellant.

Peter A. Greene, Washington, D. C., for plaintiff-appellee.

Before PELL and BAUER, Circuit Judges, and DUMBAULD, Senior District Judge.*

PELL, Circuit Judge.

This is an appeal pursuant to 28 U.S.C. § 1292(a) from an order granting the motion of Central Soya Company, Inc. ("Central Soya") for a preliminary injunction. Since the action arose under an act of Congress regulating commerce, Revised Interstate Commerce Act, 49 U.S.C. §§ 11101(a) and 11121(a), the district court had jurisdiction pursuant to 28 U.S.C. § 1337.

The factual background of the matter is as follows. Central Soya purchases grain at elevators in the midwest and ships it east for export. Most of this shipping is done by railroad, and Central Soya's Baltimore elevator is serviced only by the tracks of appellant Consolidated Rail Corporation ("Conrail"). The most economical means of transporting grain is in covered hopper cars, a specialized type of equipment designed solely for that purpose. Because the grain trade is seasonal, however, peaking from October through April, there is a shortage of covered hopper cars during that period. Conrail has not attempted, nor is it required under Rule 37 of Uniform Freight Classification No. 13 to attempt, to acquire a fleet of cars sufficient to meet the demands of the peak shipping season.[1] Although Central Soya cannot obtain cars from any common carrier other than Conrail, *see* 49 C.F.R. § 1033.15(b), it does furnish some of its own cars.

---

* Judge Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, is sitting by designation.

1. Because the covered hopper cars do not have many uses other than transporting grain, there is a surplus of the cars during the off season.

Conrail publishes tariffs which set forth unit train rates applying to shipments of at least ninety-two cars at one time for five or more consecutive trips from points in the midwest to North Atlantic ports. Tariff 794–F, which was effective December 30, 1978, was published by twelve participating carriers, including Conrail, and was duly filed with the Interstate Commerce Commission. The tariff provided that shippers could elect to book one or more sets of unit train equipment for a specified number of trips within a one year period, with the number of trips booked per shipper not to exceed forty-five. The charge per trip stood in an inverse additive relationship to the number of trips, becoming lower as the number of trips booked increased.

In accordance with the above tariff provisions, Central Soya booked forty-five trips in two unit trains, each train consisting of one hundred covered hopper cars. One of these unit trains, Train 4–TR is the subject of this litigation.

On March 2, 1979, Conrail notified Central Soya that Train 4–TR was being removed from Central Soya's service, effective immediately, despite the fact that Central Soya had completed only twelve of the forty-five trips it had specified pursuant to the terms of the tariff. Three days later, Central Soya filed the complaint in this action, together with a motion for a temporary restraining order and a preliminary injunction, in the United States District Court for the Northern District of Indiana, alleging that the removal of Train 4–TR would result in the inability of Central Soya to make two and one-half unit train ship-ments each month. The complaint further alleged that because of the volatility of the grain market, the profits which would be lost as a result of Conrail's action would be incalculable. The district court thereafter granted the motion for a preliminary injunction.[2]

On appeal, Conrail contends that its reassignment of Train 4–TR was occasioned by Central Soya's inefficient utilization of unit trains,[3] and was consequently conducted pursuant to its statutory obligations. It further asserts that the reasonableness of its decision to reallocate the cars may be reviewed only within the primary jurisdiction of the ICC, that the district court therefore had no jurisdiction, and that even if the district court properly assumed jurisdiction, its construction of the applicable tariff was in error.

While recognizing the importance of a resolution of the issue to both the railroad and grain exporting industries, we must first address a question relating to the justiciability of the controversy. In response to questions from the court during oral argument, the parties acknowledged that the grain export shipping season has now ended, and that Central Soya has now completed its use of Train 4–TR and returned it to Conrail. An issue therefore exists as to whether the instant action is moot, and further briefing on that subject was requested.

The judicial power of courts established under Article III of the Constitution extends only to matters which are present "cases" or "controversies" in the constitu-

---

2. The complaint in the action was filed with a motion for a temporary restraining order. Because the Fort Wayne Division of the Northern District of Indiana was unable to hear the case on the day on which it was filed, the motion was referred initially to Judge Phil M. McNagny, Jr., of the Hammond Division. After a hearing on March 5th and 6th, Judge McNagny denied the motion without opinion, and, by prior agreement, referred the motion for a preliminary injunction to Judge Eschbach of the Fort Wayne Division. An evidentiary hearing was held on that motion on March 20, 1979.

3. Central Soya had a total of nine one-hundred car unit trains making shipments to its Baltimore elevator during the period preceding the reassignment. In January these trains sat idle for an amount of time equal to thirty-four days for one one-hundred car train. In February, Central Soya lost forty-four train days. Central Soya attributed the delays to unusually severe winter weather in the eastern United States during the relevant time frame. While a Conrail witness testified that other shippers did not experience such lengthy delays, the district court noted that no specific examples were given in support of that conclusion.

tional sense. Moot cases do not fall within this constitutional definition, *see Liner v. Jafco, Inc.*, 375 U.S. 301, 306, n.3, 84 S.Ct. 391, 394, n.3, 11 L.Ed.2d 347 (1964), and a federal court cannot decide a question which will not affect the rights of the litigants before it. *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705, 40 L.Ed.2d 164 (1974); *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). If there is a question as to whether a particular matter is moot, a federal court must resolve that issue before it assumes jurisdiction, *id.*, and an actual controversy must continue to exist at all stages of appellate review. *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973); *SEC v. Medical Committee for Human Rights*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972).

■ The fact that the dispute over the unit train in question has ended, and that there are no incidental damage claims to be adjudicated,[4] strongly suggests that the action is moot. Our analysis would not be complete, however, without an examination of that aspect of the mootness doctrine relating to those cases which are "capable of repetition, yet evading review." *See SEC v. Sloan*, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978); *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). While the parties have termed the capable of repetition line of cases an exception to the mootness bar, we note at the outset our disagreement with that terminology. The rule barring an assertion of federal jurisdiction over moot cases is a constitutional one, and the constitution does not permit exceptions. Rather, this aspect of the mootness doctrine should be considered as an area where, for reasons of policy, and in the interests of justice,[5] a federal court will view facts broadly in order to find the requisite basis for jurisdiction.[6]

Actions which are found to be "capable of repetition" generally involve an allegation that a statute or continuing government policy or course of conduct has a substantial adverse effect on the rights of the com-

4. Even if the principal claim involved in a lawsuit has been extinguished by the passage of time or the course of events, federal jurisdiction may nevertheless be asserted over the entire matter if any unsettled claims remain. Thus, an appended claim for damages has been held sufficient to save an otherwise moot action from dismissal. *See, e. g., Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

5. Were it not for the fact that a federal court may, in appropriate cases, apply the "capable of repetition" analysis, "a significant class of federal claims [might] remain unredressed for want of a spokesman . . .. Such a consideration would not itself justify any relaxation of the provision of Art. III which limits . . . jurisdiction to 'cases and controversies,'" but it is a factor which supports application of the doctrine in permissible cases, if consistent with Art. III. *See Sosna v. Iowa*, 419 U.S. 393, 401, n.9, 95 S.Ct. 553, 558, 42 L.Ed.2d 532 (1975).

6. A second such area of the mootness doctrine involves application of the principle that the "voluntary cessation of illegal conduct does not deprive the tribunal of power to hear and determine the case." *United States v. W. T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In *W. T. Grant*, the Supreme Court sustained a district court's decision to assume jurisdiction after the offending defendant had resigned from his interlocking directorates, reasoning that a controversy still existed as to the legality of the challenged conduct. Otherwise, the defendant would have been free to return to the same course of conduct which engendered the lawsuit. *See also Atlantic Richfield Co. v. Oil, Chemical and Atomic Workers International Union*, 447 F.2d 945, 947 (7th Cir. 1971) (voluntary cessation of wrongful conduct, while not defeating a court's power to act, may eliminate need for injunctive relief). This line of cases is not, however, applicable to the facts of this case, because the mootness issue arises not from any voluntary cessation by Conrail, but rather from the simple fact that the export grain shipping season is over, and Train 4–TR has now been returned to the carrier.

The *W. T. Grant* case was in any event decided prior to the time that the mootness doctrine was accorded constitutional status, and there may be a question, which we need not decide here, as to its continuing validity. Because we consider the *W. T. Grant* line of decisions to involve a different aspect of mootness, we note that we do not consider the citation by the parties of cases in that group as binding or even persuasive in interpreting the scope of the "capable of repetition" line of decisions.

plaining parties. For example, in *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), an employer who was engaged in cyclical collective bargaining sought a declaratory judgment as to the invalidity of a state statute which permitted striking workers to receive public assistance through state welfare programs. Notwithstanding that the strike had terminated prior to any hearing in the case, the Court held the jurisdictional requirements of both the Declaratory Judgment Act and the Constitution to be satisfied:

> [T]he challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the complaining parties.

*Id.* at 122, 94 S.Ct. at 1698. The Court further emphasized that the governmental conduct of paying benefits to strikers was not dependent on the exercise of executive discretion.

Similarly, in *Roe v. Wade, supra,* the Court reached the merits of the constitutionality of the Texas abortion statute, despite the fact that the complaining party, while pregnant at the time the action was filed, was no longer pregnant at the time of the district court hearing.

Clearly, in both *Roe* and *Super Tire,* the fact that a significant class of federal claims might continually escape adjudication was a substantial factor in the Court's decision to permit assertion of federal jurisdiction. It was not this factor alone, however, that established jurisdiction under Article III. Rather, the necessary case or controversy stemmed from the fact that: (1) the plaintiffs had alleged the existence of a right; (2) the right was alleged to be the subject of an existing violation at the time the complaint was filed; and, (3) the violation of the right would continue in the future and was not a matter of speculation or conjecture but of reasonable expectation, because of the existence of a statute or a policy of sufficient permanence to amount to the "brooding presence" described in *Super Tire.* Thus, the "capable of repetition" rationale looks to both present and future circumstances to ensure that the contemplated assertion of federal jurisdiction is predicated on an ongoing controversy.

Before determining whether the present litigation falls within the bounds of the capable of repetition doctrine, however, we are first called upon by the briefs to analyze the applicability of that line of cases to actions where the challenged conduct is private rather than governmental. It is true that the rationale has in the past been employed almost exclusively in cases which involved government actions or policies. For example, in the seminal case in the area, *Southern Pacific Terminal Co. v. ICC, supra,* the plaintiff sought an injunction against an ICC order which allegedly gave preferences and advantages to a certain shipper. Because the order had expired by its own terms before the action reached the Supreme Court, the Court was required to decide whether the action was moot. In holding that a justiciable controversy still existed, the Court emphasized that the interests which would be affected by a decision on the validity of the order were of a public and therefore nonextinguishable character. *Super Tire Engineering Co. v. McCorkle, Roe v. Wade,* and *SEC v. Sloan, supra,* rested on an analogous rationale in that the challenged conduct in those actions was governmental and therefore sufficiently permanent in nature to assure an ongoing controversy between the government's right to engage in the conduct and the individual whose rights were allegedly violated by the conduct.

■ Based upon our analysis of the logic employed by the Court in the above decisions, we think that the "capable of repetition, yet evading review" doctrine has thus far been invoked principally in actions involving government, not because it is *per se* applicable only to government conduct, but rather merely because the existence of a statute or ongoing government policy is the factual circumstance which most frequently

engenders the constitutionally requisite continuum of controversy. We therefore hold that the "capable of repetition" doctrine may permissibly be applied in appropriate cases involving private conduct.[7]

■ We next turn to the question of whether the present action is in fact such a case. In *Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975), the Court held the "capable of repetition" rationale to be properly applied where two elements combined. First, the challenged action must be too short in duration to be fully litigated prior to its cessation or expiration. This limitation would appear to be prudential in nature, for the legitimacy of Article III jurisdiction in capable of repetition cases stems from the continuing nature of the controversy rather than from the brevity of isolated occurrences of the conduct complained of. It is perhaps explained, however, by the fact that the capable of repetition doctrine, while within the parameters of the Constitution, does extend federal jurisdiction to its permissible limits, and the Court prefers, where possible, to adjudicate more conventional and concrete cases.[8] Second, there must be a reasonable expectation that the same complaining party will be subjected to the challenged conduct again. This limitation would appear to be constitutionally required in order to ensure the existence of an ongoing controversy.

While it is true that the relatively short October through April shipping season would appear to make the challenged action of sufficiently brief duration to satisfy the first element, we do not think the second element is present here.

In order for the requirements of Article III to be satisfied, it is not enough, as Conrail has contended, that a federal court may again be called upon to decide the legal issue raised in this litigation. Rather, there must be a reasonable degree of likelihood that this issue will be the basis of a continuing controversy between *these two parties*. While it is, of course, possible that Conrail will at some point in the future contract with Central Soya to furnish covered hopper cars, that Central Soya will, for whatever reason, utilize the cars with less than optimal efficiency, and that Conrail will thereafter purport to reassign those hopper cars, such a chain of speculation is, without more, inadequate to support an assertion of federal jurisdiction.

Because it therefore appears that the instant action is moot, the case is remanded to the district court under the rule of *United States v. Munsingwear, Inc.*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), with instructions to dismiss the complaint. Costs on appeal are awarded to the appellee against the appellant.

---

7. We note that our decision on this issue is in agreement with that of the Fourth Circuit Court of Appeals. *See Cedar Coal Co. v. United Mine Workers of America*, 560 F.2d 1153 (4th Cir. 1977) ("As a matter of principle, we doubt that a court is any less obliged to do justice between man and man than between citizen and sovereign." *Id.* at 1167.)

8. One purpose which is arguably served by the mootness doctrine is the preservation of flexibility in the law by not creating unnecessary precedent. *See* Note, *Mootness in the Supreme Court*, 88 Harv.L.Rev. 373, 376, n.14 (1974). This purpose seemingly would be served by stretching Article III jurisdiction to its limits only in those cases which would in fact otherwise evade review.