# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued September 10, 2004        Decided January 28, 2005

No. 02-7106

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,
APPELLEE

v.

ANTHONY GITTENS, EXECUTIVE DIRECTOR,
DISTRICT OF COLUMBIA COMMISSION ON THE ARTS AND
HUMANITIES, AND DISTRICT OF COLUMBIA,
APPELLANTS

---

Consolidated with
Nos. 03-7190, 03-7195

---

Appeals from the United States District Court
for the District of Columbia
(02-cv00984)

---

*Donna M. Murasky*, Senior Litigation Counsel, Office of the Attorney General for the District of Columbia, argued the cause for appellants. With her on the briefs were *Robert J. Spagnoletti*, Attorney General, and *Edward E. Schwab*, Deputy Attorney General.

*Arthur B. Spitzer* argued the cause for appellee. With him on the brief was *Fritz Mulhauser*.

Before: GINSBURG, *Chief Judge*, and RANDOLPH and ROGERS, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* ROGERS.

RANDOLPH, *Circuit Judge*: Several years ago, an agency of the District of Columbia sponsored a city-wide, outdoor exhibit of polyurethane models of donkeys and elephants, each painted and decorated by a different artist. The exhibit lasted five months. The parties to these consolidated appeals argue about whether, as the district court ruled, the agency violated the First Amendment to the Constitution when it rejected a design showing a circus elephant weeping from mistreatment. We do not reach the constitutional issue because the case may be moot. To explain why, we need to fill in some details about the exhibit.

In the fall of 2001, the District's Commission on the Arts and Humanities issued a "Call to Artists" for "Party Animals," a program intended to showcase local artists, attract tourists and enliven the streets "with creative, humorous art." "Party Animals" would be the "largest public art project in the history of the District of Columbia." It would consist of pre-formed sculptures of 100 donkeys and 100 elephants, four and one-half feet tall and five feet long, installed at prominent city, federal and private locations. The Commission invited artists to submit designs for painting and decorating the models. If the Commission's selection committee approved a design, the artist would receive a $1,000 honorarium and $200 for materials and supplies. The Commission retained ownership of the decorated donkeys and elephants and planned to sell them at auction after the exhibit ended.

The written announcement stated that "Party Animals" would showcase the "whimsical and imaginative side of the Nation's Capital" and that the Commission was looking "for artwork that is dynamic and invites discovery," "original and creative," "durable" and "safe." The Commission would not "allow direct advertising of any product, service, a company name, or social disrespect," and would impose "restrictions against slogans and inappropriate images." All designs "were subject to the Selection Committee's decision." More than 1,000 artists entered designs, most of which the Selection Committee rejected.

The Arts Commission also announced that it would accept designs outside of the general artistic competition from individuals or organizations who paid $5,000 or more to be high-level sponsors of the program. These sponsors could choose their own artist to decorate a donkey or elephant, which would be placed in a "prime public location." The written announcement stated that the Arts Commission "reserves the right of design approval" and would own the decorated donkey or elephant.

On the base of each sculpture was a plaque with the artist's name and the following:

> DC Commission on the Arts & Humanities
> Anthony A. Williams, Mayor
> www.partyanimalsdc.org

An organization contributing $2,000 or more was entitled to have its name on the plaque.

In mid-March 2002, People for the Ethical Treatment of Animals, Inc. -- PETA -- submitted a sponsorship package, a

check for $5,000, and a sketch of its proposed design, drawn by a cartoonist. PETA describes itself as a nonprofit corporation, founded in 1980, to support "the principle that animals are not ours to eat, wear, experiment on, or use for entertainment." Brief of Appellee at 5. The sketch PETA submitted depicted an elephant with a sign tacked to its side. The sign read:

> The CIRCUS is Coming
> See: Torture
> Starvation
> Humiliation
> All Under the Big Top

A selection committee member informed PETA that its design was unacceptable. Several days later, PETA submitted two new designs, one of a happy circus elephant, the other of a sad, shackled circus elephant with a trainer poking a sharp stick at him. The committee member called PETA's representative to say that the Commission had accepted the happy elephant, but rejected the sad one. PETA then submitted another design, depicting a shackled elephant crying. A sign tacked to the elephant's side read: "The Circus is coming. See SHACKLES - BULL HOOKS - LONELINESS. All under the 'Big Top.'" The Commission rejected this design. According to an affidavit of the Commission's executive director, PETA's proposal was "a political billboard, not art, and unlike any other design submission, it sought merely to promote a single issue and was not an artistic expression consistent with the goals, spirit and theme of the art project. The "Party Animals" arts project was designed to be festive and whimsical, reach a broad based general audience and foster an atmosphere of enjoyment and amusement. PETA's proposed . . . design did not compliment these goals, and indeed was contrary to the Party Animals' expressive, economic, aesthetic, and civic purpose."

The "Party Animals" exhibit opened at the end of April 2002. One month later, PETA filed an action under 28 U.S.C. § 1983 against the executive director of the Arts Commission and the District of Columbia, seeking a preliminary and permanent injunction and damages for violation of its First Amendment rights. While the case was pending, PETA submitted still another design to the Commission, slightly altering its previous submission. Again the Commission rejected it, for reasons similar to those given for rejecting PETA's previous submission. All the while, the Commission held PETA's $5,000 check without cashing it.

After proceedings unnecessary to recount, the district court issued a preliminary injunction, finding that the Commission had violated PETA's freedom of speech and requiring the Commission to display PETA's final elephant. *People for the Ethical Treatment of Animals v. Gittens*, 215 F. Supp. 2d 120 (D.D.C. 2002). The District then cashed PETA's check and PETA had its elephant installed at Connecticut Avenue and Q Street, N.W. It remained there from the end of August until the end of September 2002, when "Party Animals" closed. In November 2003, the court issued a memorandum opinion and order granting PETA's motion for summary judgment, denying the District's cross-motion, and awarding PETA "$4,000 in damages." In late December 2003, the court issued the another order, stating:

> Upon consideration of Plaintiffs' [sic] Motion for an Order Directing Entry of Judgment, of defendant's [sic] consent thereto, and of the entire record herein, it is hereby

> ORDERED, that the motion is GRANTED; and it is further

> ORDERED, that the Clerk shall enter judgment in

favor of plaintiffs [sic] and against the District of Columbia in the amount of $4,000.

The Clerk of the court entered the judgment on December 23, 2003.

The District noted an appeal from the order granting the preliminary injunction (No. 02-7106), from the November 2003 memorandum and order granting summary judgment (No. 03-7190), and from the December 2003 judgment for $4,000 (No. 03-7195).

The "Party Animals" exhibit is long gone. But the parties assume the December 2003 judgment awarding PETA $4,000 keeps the First Amendment controversy alive.[1] We need to examine their assumption carefully. There is "a long line of Supreme Court pronouncements counseling judicial restraint in constitutional decisionmaking, the most notable of which is *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring)." *Kalka v. Hawk*, 215 F.3d 90, 97 (D.C. Cir. 2000). We therefore must assure ourselves that the First Amendment controversy between PETA and the District has not expired.

The operative portion of the district court's opinion states:

[T]he plaintiff contends that it should be awarded money

---

[1] Although the District noted an appeal from the November memorandum and order, the order was not "set forth on a separate document," FED. R. CIV. P. 58(a), and therefore was not an effective judgment from which an appeal could be taken. *See Kidd v. Dist. of Columbia*, 206 F.3d 35, 37 (D.C. Cir. 2000). Even so, the reasoning contained in the court's November memorandum underlies the December judgment.

damages for its loss of First Amendment rights caused by the defendants' failure to display its sculpture design. It is undisputed that the $5,000 sponsorship level entitled the sponsor to have its sculpture placed in a prominent place in the city for the five months of the Party Animals display. As a result of the time necessary to litigate the court-ordered injunction, the plaintiff's sculpture was only on display in a prominent location for one month. The plaintiff believes, and the defendants have not argued otherwise, that it is entitled to a refund, in essence, for the four months it was excluded from the public eye. The Court agrees, and accordingly awards the [plaintiff] $4000 in damages.

*People for the Ethical Treatment of Animals v. Gittens*, No. 02-00984, slip op. at 6 (D.D.C. Nov. 14, 2003).

If the district court awarded PETA the $4,000 as compensatory damages for a violation of its First Amendment rights, the District's appeal from the grant of summary judgment is not moot. *See, e.g.*, *Powell v. McCormack*, 395 U.S. 486, 497-98 (1969). But if PETA's recovery did not turn on the validity of its First Amendment claims -- and there are several indications that it did not -- the $4,000 award could not save the constitutional issue from mootness. Although the court began by noting PETA's contention that it was entitled to $4,000 for the "loss of First Amendment rights," the court ended by calling the $4,000 a "refund, in essence, for the four months it was excluded from the public eye." This may suggests that the court was simply enforcing the terms of the "Party Animals" program and that PETA would have received the refund even if it had not prevailed on its constitutional claim. *See* RESTATEMENT (SECOND) OF CONTRACTS § 240 cmt. d, illus. 5 (1981). Or the court could have been ordering relief in the nature of restitution, relief that does not depend on the defendant's wrongdoing. *See* DAN B. DOBBS, REMEDIES § 4.1, at 224 (1973) ("restitution is

generally awarded when the defendant has gained a benefit that it would be unjust for him to keep, though he gained it honestly"); *Rapaport v. United States Dep't of the Treasury*, 59 F.3d 212, 217 (D.C. Cir. 1995). According to the "Party Animals" announcement, $5,000 entitled PETA to have an animal displayed in a prominent place for five months. PETA wound up getting only one month. The District admitted at oral argument that if PETA's animal had never been displayed, the District would have refunded the entire $5,000. This is consistent with the fact that during the first four months of the exhibit, while the District was refusing to accept PETA's designs, it did not cash PETA's check.

It is true that PETA's complaint did not seek a refund under the terms of the program. But this is not conclusive. In addition to the constitutional claim, brought under 42 U.S.C. § 1983, the complaint requested "such other and further relief as the Court may deem just and proper." This language permits a district court to award damages for breach of contract even when the plaintiff has not pled a contract claim. *See, e.g.*, *U.S. Naval Inst. v. Charter Communications, Inc.*, 936 F.2d 692 (2d Cir. 1991). Federal Rule of Civil Procedure 54(c) also empowers courts to grant the relief to which the prevailing party is entitled, regardless whether the party specifically requested the relief in its complaint.

We recognize the principle that when a court finds a constitutional violation in an action seeking monetary relief under 42 U.S.C. § 1983, the court (or jury) must at least award nominal damages. *See Farrar v. Hobby*, 506 U.S. 103, 112 (1992); *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986); *Carey v. Piphus*, 435 U.S. 247, 266 (1978); *Hobson v. Wilson*, 737 F.2d 1, 59-60 (D.C. Cir. 1984); *Kerman v. City of New York*, 374 F.3d 93, 131-32 (2d Cir. 2004); *Norwood v. Bain*, 143 F.3d 843, 856 (4th Cir. 1998),

*aff'd en banc in relevant part*, 166 F.3d 243 (1999); *Risdal v. Halford*, 209 F.3d 1071, 1072 (8th Cir. 2000); *Schneider v. County of San Diego*, 285 F.3d 784, 794 (9th Cir. 2002); *Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001). We assume, without deciding, that a district court's award of nominal damages -- $1 -- prevents a case from becoming moot on appeal. *See Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1262 (10th Cir. 2004) (McConnell, J., concurring); *cf. Arizonans for Official English v. Arizona*, 520 U.S. 43, 71 (1997). Even so, in this case if the $4,000 merely represented restitution or a refund under the terms of the "Party Animals" program that was not dependent on a constitutional violation, PETA has forfeited any such claim to nominal damages. *See Oliver v. Falla*, 258 F.3d 1277, 1281-82 (11th Cir. 2001). PETA told the district court that if the case went to trial it would seek damages greater than $4,000 for the District's alleged First Amendment violation. But the case did not go to trial; the district court awarded only the uncontested $4,000; and PETA did not cross-appeal.

In short, it is unclear whether the district court's award of $4,000 was dependent upon its finding of a constitutional violation. Ordinarily, we would remand the record for clarification and end our opinion at this point. But a remand is unnecessary if, as the District argues, its appeal from the preliminary injunction continues to present a live controversy under the First Amendment. *See Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. Dist. of Columbia*, 972 F.2d 365, 371 n.2 (D.C. Cir. 1992) ("*KKK*").

The preliminary injunction clearly rested on the First Amendment, but it expired at the close of the "Party Animals" exhibit more than two years ago. "An appeal from an order granting a preliminary injunction becomes moot when, because of the defendant's compliance or some other change in

circumstances, nothing remains to be enjoined through a permanent injunction." *KKK*, 972 F.2d at 369; *see Univ. of Texas v. Camenisch*, 451 U.S. 390, 394-95, 398 (1981). The District seeks to rescue its appeal in No. 03-7195 on the basis of the doctrine that issues or wrongs "capable of repetition, yet evading review" are not moot.

We use the words "issues or wrongs" because Supreme Court opinions are not uniform in their description of exactly what must be repeatable in order to save a case from mootness. In the decision giving rise to the doctrine, the Court spoke of "short term orders [of an agency], capable of repetition, yet evading review." *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911). Later cases speak not of orders, but of repetition of the "controversy," *e.g., Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 594 n.6 (1999); *Norman v. Reed*, 502 U.S. 279, 288 (1992); *Int'l Org. of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 473 (1991), or "the questions presented," *Sosna v. Iowa*, 419 U.S. 393, 399-400 (1975). Other cases put the matter in terms of the plaintiff suffering the "same wrong again," *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990); *Los Angeles v. Lyons*, 461 U.S. 95, 109, 111 (1983), or being subjected to the "same action again," *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975); *Spencer v. Kemna*, 523 U.S. 1, 17-18 (1998); *Lewis*, 494 U.S. at 481; *Murphy v. Hunt,* 455 U.S. 478, 482 (1982) (per curiam) (quoting *Weinstein*). One opinion, *Honig v. Doe*, 484 U.S. 305 (1988), uses several variations, *see id.* at 318 (same "deprivation"); *id.* at 319 n.6 (same controversy); *id.* at 320 (same injury). For our part, we too have been less than precise, sometimes requiring the issue, and sometimes the wrong, to be capable of repetition. *E.g., WorldCom, Inc. v. FCC*, 308 F.3d 1, 10-11 (D.C. Cir. 2002) (issue); *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 632-33 (D.C. Cir. 2002) (issue); *The Honorable John H. McBryde v. Comm. to Review Circuit Council Conduct*, 264 F.3d 52, 55 (D.C. Cir. 2001) (injury);

*Time Warner Entm't Co. v. FCC,* 240 F.3d 1126, 1128 (D.C. Cir. 2001) (issue); *KKK*, 972 F.2d at 369, 370 (issue); *Clarke v. United States*, 915 F.2d 699, 703-04 (D.C. Cir. 1990) (en banc) (wrong).

We treat these various formulations as equivalent. The "wrong" that is, or is not, "capable of repetition" must be defined in terms of the precise controversy it spawns. To illustrate, in the *KKK* case, the Klan sought a permit to march thirteen blocks along Constitution Avenue; the District, fearing a violent response from onlookers, granted a permit for only half the distance; the district court issued a preliminary injunction allowing the Klan to march the thirteen blocks. By the time the case reached this court on the District's appeal, the march was over. If one defined the "wrong" as the District's refusal to allow the Klan to march along the entire route it requested, that would tell us nothing about the constitutional controversy or the likelihood of its recurrence. There are any number of reasons -- some legitimate and some not -- why the authorities might cut back on the length of a parade: the time of the march and its route might interfere with rush hour traffic; there might be conflicting events; one portion of the street might be undergoing repairs; the message of the marchers might be disfavored; and so forth. One function of the "capable of repetition" doctrine is to satisfy the Constitution's requirement, set forth in Article III, that courts resolve only continuing controversies between the parties. *Pharmachemie B.V.*, 276 F.3d at 633 (quoting *Cent. Soya Co. v. Consol. Rail Corp.*, 614 F.2d 684, 689 (7th Cir. 1980)). That function cannot be fulfilled unless the alleged "wrong" is put in terms of the legal questions it presents for decision. In the *KKK* case, the "wrong" consisted of the District's refusal, in alleged violation of the First Amendment, to grant a permit because the march would provoke violence. This is the way we defined the controversy in order to determine whether it was "capable of repetition, yet evading review."

*KKK*, 972 F.2d at 369-70.

For a controversy or wrong to be "capable of repetition," there must be at least "a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. at 147. To discover the nature of the alleged wrong to PETA, and the First Amendment issues presented, we must initially look to its complaint. *Clarke*, 915 F.2d at 703-04 (plurality opinion).

One thing to notice about the complaint is what is not alleged. Donkeys and elephants are the symbols of the two major political parties. Restricting the exhibit to these symbols excludes the symbols of all other political parties. But there is no allegation that for this reason the "Party Animals" program lacked content neutrality in violation of the First Amendment. *See, e.g., City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993). Nor is there any charge that the Commission's written design criteria -- no advertising, no "social disrespect," no "slogans and inappropriate images" -- were unconstitutional on their face. Rather, the complaint alleged that "[e]ach of PETA's proposed designs satisfied the Party Animals 'design criteria' as published and as applied by the Commission."

PETA thus concedes that the Commission "would have had a leg to stand on in rejecting PETA's design" if it had accepted "only whimsical or lighthearted designs" and had rejected "all designs with political or social messages." Brief of Appellee at 31. But, according to PETA, the Commission did not do so. Instead, it approved "numerous designs that were not whimsical," such as tributes to heroes and victims of the September 11 terrorist attacks, and designs commemorating civil rights leaders. *Id.* at 30. The Commission also approved designs "with political or social messages or slogans," such as designs incorporating the "butterfly ballot" used in Palm Beach

County, Florida in the 2000 presidential election, and a design covered with quotations by politicians or about politics. *Id.* at 11-12. PETA's argument -- with which the district court agreed -- is that the Commission modified its design criteria in practice and that "Party Animals" was a "limited public forum," at least for those who donated $5,000 or more. *Id.* at 34, citing *inter alia Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993). PETA's conclusion, with which the district court also agreed, is that the Commission therefore engaged in viewpoint or content discrimination, in violation of the First Amendment, when it rejected PETA's designs. The District, of course, disagrees. It argues that as a patron of the arts, the Commission had discretion to select "those messages it wants to promote without running afoul of the First Amendment." Brief for Anthony Gittens, *et al.* at 23, citing *inter alia Finley v. Nat'l Endowment for the Arts*, 524 U.S. 569 (1998); *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998); and *Rust v. Sullivan*, 500 U.S. 173 (1991); *see also United States v. Am. Library Ass'n*, 539 U.S. 194 (2003) (plurality opinion). The District also attempts to distinguish the non-whimsical designs it approved, some of which contained slogans and political messages, in order to show that the Commission reasonably rejected PETA's submissions as "political billboards." Brief for Anthony Gittens, *et al.* at 31-32.

Given these claims, the controversy is highly fact-specific. PETA thinks the decision turns on exactly what design criteria, written and unwritten, the Commission actually employed, whether PETA's payment of $5,000 to be a sponsor put it on a different track than the competition open to all artists, and whether, in light of the Commission's approval of numerous designs that contained civic commentary or political messages or non-whimsical statements, the rejection of PETA's designs

constituted content or viewpoint discrimination in violation of the First Amendment. To conclude that a dispute like this would arise in the future requires us to imagine a sequence of coincidences too long to credit. The District would have to sponsor another such public arts display; it would have to call upon private parties to participate in the design of the objects, while it retained ownership of the resulting artwork; in light of the particular art, PETA would have to believe it could advance its cause by participating in the program; PETA would have to submit a proposed design; the Commission would have to reject it as inconsistent with Commission's criteria; at the same time, the Commission would have to approve other designs not meeting its criteria; and those non-conforming designs would have to be analogous to the design PETA submitted.

We are told that after "Party Animals," the District sponsored "PandaMania" -- an outdoor exhibit of sculptures of panda bears designed by private artists. We also know that New York City had an outdoor exhibit of decorated cows, that one of PETA's two designs was rejected, that it sued for injunctive relief (and damages), and lost. *People for the Ethical Treatment of Animals v. Giuliani*, 105 F. Supp. 2d 294 (S.D.N.Y. 1993). We think both of these events tends to demonstrate that the issues here would not recur.

As to "PandaMania," it too was an outdoor animal exhibit run by the District. But for reasons not in the record, PETA did not participate in it. As to the cow exhibit in New York, the issues in PETA's suit were different than those presented here. There was no credible evidence that the New York authorities had engaged in viewpoint discrimination by requiring PETA to adhere strictly to certain design criteria while the authorities departed from the criteria for other submissions. Yet, as PETA's arguments in this court reveal, such evidence is at the heart of its case against the District. There are other significant

differences but we see no need to dwell on them. The essential point is that the case before us is highly dependent upon a series of facts unlikely to be duplicated in the future. We have recognized before that a "legal controversy so sharply focused on a unique factual context" would rarely "present 'a reasonable expectation that the same complaining party would be subjected to the same actions again.'" *Spivey v. Barry,* 665 F.2d 1222, 1234-35 (D.C. Cir. 1981) (quoting *Weinstein*, 423 U.S. at 149).

But if we are wrong about the possibility of repetition, we would still find the preliminary injunction moot because we are unconvinced that if a controversy of this sort occurred again it would evade judicial review. It is fair to assume that in any future action against the District, PETA would sue for an injunction and damages under 42 U.S.C. § 1983, which authorizes equitable relief and compensatory damages against any "person" who, under color of law, deprives another of a constitutional right. *See Stachura*, 477 U.S. at 309-10. Municipalities may be considered "persons" liable under § 1983 "only if their agents acted pursuant to municipal policy or custom." *Warren v. Dist. of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004). The District of Columbia is a municipality for the purpose of § 1983. *See Brown v. United States*, 742 F.2d 1498, 1500 n.2 (D.C. Cir. 1984) (en banc). The action of an official with final decision-making authority in a particular area can amount to a municipal "policy." *See McMillian v. Monroe County*, 520 U.S. 781 (1997); *Bd. of Comm'rs v. Brown*, 520 U.S. 397 (1997); *Pembaur v. Cincinnati*, 475 U.S. 469 (1986).

If PETA brought such a suit in the future, the controversy would not evade review in this court, or in the Supreme Court. *See KKK*, 972 F.2d at 369-70. The grant or denial of compensatory damages for a constitutional violation would prevent the case from becoming moot after the exhibit ended. *Arkansas Educational Television Commission v. Forbes*, 523

U.S. 666 (1998), illustrates the point. A state-owned public broadcaster sponsored a debate between the Republican and Democratic candidates in an upcoming congressional election. Forbes, an independent candidate, brought an action against the broadcaster, claiming that it had violated the First Amendment by excluding him. The district court denied a preliminary injunction and the debate went forward without him. But the case remained alive, in the court of appeals and in the Supreme Court, because Forbes coupled his injunction action with a claim for damages under § 1983. *See, e.g.*, *Powell v. McCormack*, 395 U.S. 486, 497-98 (1969).

In short, the First Amendment controversy in this case cannot be treated as capable of repetition but evading review. Mootness may be avoided only if the district court, on remand of the record, determines that the $4,000 award to PETA was contingent on the District's alleged violation of the First Amendment.

The appeal in No. 03-7190 is therefore dismissed, *see* FED. R. CIV. P. 58(a). The appeal in No. 02-7106 is dismissed as moot. In No. 03-7195, the record is remanded to the district court to clarify whether its $4,000 award rested on its finding of a First Amendment violation. *See* D.C. CIR. R. 41(b); *United States v. Williams*, 754 F.2d 1001, 1002-03 (D.C. Cir. 1985).

*So ordered.*

ROGERS, *Circuit Judge*, concurring in part and dissenting in part: While the court must take care to ensure that a constitutional issue is properly before it, Op. at 6, the court strains, in my view, to remand the record premised on a contorted reading of the district court's opinion. *Id*. at 7-8. In addition, the court reaches the unfounded conclusion that PETA has forfeited any claim to nominal damages for the violation of its First Amendment rights, and ignores PETA's claim for compensatory damages. *Id.* at 9. Because there is no occasion for a remand, I respectfully dissent to the remand in No. 03-7195.

The district court's Memorandum Opinion and Order granting summary judgment to PETA found that the District of Columbia had violated PETA's First Amendment rights; the district court found no other violation as a basis for granting judgment to PETA. In what this court styles as "[t]he operative portion of the district court's opinion," the district court in awarding PETA judgment refers to PETA's claim that "it should be awarded money damages for its loss of First Amendment rights," and refers to its own monetary award as "$4,000 in damages." *Id.* at 6-7 (quoting the district court). The district court's language is precise - it awarded "damages," and in an amount that is not nominal. While the district court also refers to "a refund" in recounting PETA's argument, the district court's reference is to "a refund, in essence," suggesting an effort to quantify the amount of damages, and not, as the court speculates, to award a refund on a separate and non-existent contract claim. *See id.* at 7. The qualified reference in recounting a party's argument presents no basis to go behind the district court's plain words.

In holding that the district court was empowered to grant a refund even though PETA did not specifically request a contract remedy, the court relies on Federal Rule of Civil Procedure

54(c), Op. at 8, which provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." However, Rule 54(c) does not provide that the court may award relief for a new, unstated claim. To the contrary, Federal Rule of Civil Procedure 8(a)(2) requires a complaint to state "the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), *see Conley v. Gibson,* 355 U.S. 41, 47 (1957), and after judgment on the merits it is too late to inject a new contractual claim into the litigation. The court's reliance on *United States Naval Institute v. Charter Communications, Inc.*, 936 F.2d 692 (2d Cir. 1991), Op. at 8, is misplaced, for the Second Circuit was determining the relief to which a party already had been deemed "entitled" to recover for a breach of contract, and mentioned Rule 54(c) only in that law-of-the-case context. *U.S. Naval Inst.,* 936 F.2d at 696.

Additionally, the court's conclusion that PETA forfeited its claim for nominal damages is unfounded. While the court purports to recognize the principle that PETA would be entitled to at least an award of nominal damages for the violation of its First Amendment rights, Op. at 8, the court avoids deciding whether this entitlement would prevent mootness, if the district court advises on remand that the $4,000 constitutes only a refund, by holding that PETA has forfeited such claim. *Id*. at 9. The court unreasonably concludes that PETA should have recognized the contorted reading the court gives the district court's award of "$4,000 in damages" and filed a cross-appeal for nominal damages. *See id.* The court points to PETA's statement that if the case went to trial it would seek "damages greater than $4,000." *Id*. But this statement evinces PETA's view that the amount it would be awarded upon the grant of summary judgment would be damages, not a refund on a contract claim. PETA's statement clearly is not an intentional and knowing waiver of a right, *see, e.g., Johnson v. Zerbst,* 304

U.S. 458, 464 (1938), but it also is not a forfeiture, which can arise only upon the "failure to make the timely assertion of a right." *United States v. Olano*, 507 U.S. 725, 733 (1993).

PETA timely sought compensatory or, alternatively, nominal damages in the district court. PETA's amended complaint, filed pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201-2002, requested "actual damages for the loss of its First Amendment rights as it may prove at trial, or at a minimum nominal damages;" its motion for summary judgment sought "damages in the amount of $4,000 as compensation for [the First Amendment] violation." Without notice that the award of "$4,000 in damages" might only be a refund, PETA cannot have forfeited its claim for compensatory or nominal damages when it did not cross-appeal. *See Banks v. Horn,* 271 F.3d 527, 534 (3d Cir. 2001), *rev'd on other grounds, Horn v. Banks,* 536 U.S. 266 (2002). No Federal Rule put PETA on notice that a cross-appeal for compensatory or nominal damages was necessary. *Cf.* Fed. R. Civ. P. 51(a) & (c); *Penn. v. Harris,* 296 F.3d 573, 577 (7th Cir. 2002); *Oliver v. Falla*, 258 F.3d 1277, 1281-82 (11th Cir. 2001); *Alexander v. Riga*, 208 F.3d 419, 429 (3d Cir. 2000), *cert. denied,* 531 U.S. 1069 (2001). Rule 54(c), relied on by the court, Op. at 8, does not suggest that PETA's requested relief for "damages in the amount of $4,000 as compensation" for violation of its First Amendment rights -- to which the district court found PETA was "entitled" -- can be ignored because PETA's complaint also includes boilerplate language requesting such other relief as may be appropriate. *See* Op. at 8.

Under the circumstances, there was no reason for PETA to suppose that it had not been awarded compensatory damages, much less *any* damages, for the violation of its First Amendment rights, particularly as such supposition would impute legal error to the district court, and to cross-appeal for an award of

compensatory or nominal damages. But even assuming a forfeiture of a claim for nominal damages, were the district court on remand to advise that its award to PETA of "$4,000 in damages" was, in fact, only a refund on a contractual claim, PETA's claim for compensatory damages would remain. PETA's constitutional claim, then, could not be dismissed on mootness grounds. Op. at 7 (citing *Powell v. McCormack,* 395 U.S. 486, 497-98 (1969)). The reason for a remand thus evaporates.

I concur in the dismissal of the District of Columbia's appeal in No. 03-7190 from the November 2003 memorandum opinion and order granting summary judgment. *Id*. at 16. While I concur in dismissing the appeal in No. 02-7106 from the order granting the preliminary injunction as moot, *id.* at 10, 16, I do so only to the extent that the court concludes PETA's First Amendment claim is not an issue evading judicial review. *Id.* at 15.