# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 30, 2025          Decided March 13, 2026

No. 20-1107

CLEAN FUELS ALLIANCE AMERICA,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, ET
AL.,
INTERVENORS

———

Consolidated with 20-1113

———

On Petitions for Review of a Final Action
of the Environmental Protection Agency

———

*David M. Lehn* argued the cause for petitioners. With
him on the briefs were *Bryan Killian* and *Douglas A. Hastings*.
*Claire H. Chung* entered an appearance.

*Kimere J. Kimball*, Attorney, U.S. Department of Justice,
argued the cause for respondents. With her on the brief were

*Adam R.F. Gustafson*, Principal Deputy Assistant Attorney General, *Tsuki Hoshijima*, Attorney, and *Lucas May*, Attorney, U.S. Environmental Protection Agency.

*Elizabeth B. Dawson* argued the cause for intervenors American Fuel & Petrochemical Manufacturers, et al. With her on the brief were *Jonathan G. Hardin*, *Alexandra Magill Bromer*, *Michael R. Huston*, *Robert J. Meyers*, *Richard S. Moskowitz*, and *Tyler J. Kubik*. *Karl J. Worsham* entered an appearance.

Before: MILLETT, WILKINS, and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

GARCIA, *Circuit Judge*: Under the Clean Air Act's Renewable Fuel Standard (RFS) Program, EPA directs the fuel industry to introduce a certain volume of renewable fuel into commerce each year. To meet these annual goals, EPA promulgates standards that prescribe a percentage of each refinery's fuel output that must consist of renewable fuel.

This case began in 2020 as a challenge to EPA's 2020 percentage standards. But it was then held in abeyance for several years. In the interim, both petitioners' requested relief and the legal landscape have materially changed. Because those developments have mooted this case, we dismiss the consolidated petitions.

**I**

This court has repeatedly described the RFS Program in depth. *See Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 162–65, 163 n.1 (D.C. Cir. 2025) (per curiam). We include here only those details that are necessary to understand our disposition.

3

**A**

Created in 2005, the RFS Program is administered by EPA and requires a certain target "volume of renewable fuel" to be "sold or introduced into commerce in the United States" each year. 42 U.S.C. § 7545(o)(2)(A)(i). To that end, EPA calculates annual "percentage standards" that determine how much renewable fuel "obligated parties"—refiners and importers of transportation fuel—must introduce each year. *See Ctr. for Biological Diversity*, 141 F.4th at 163 (explaining how entities may comply). In general terms, EPA calculates the standards by "divid[ing] the applicable [target] volume . . . by an estimate of the national volume of non-renewable transportation fuel that will be used that year." *Sinclair Wyo. Refin. Co. v. EPA*, 101 F.4th 871, 881 (D.C. Cir. 2024).

The statute also allows certain small refineries to apply "at any time" for exemption from a particular year's standard if that standard presents a "disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B)(i). Those exemptions affect the accuracy of EPA's percentage standard formula. Unless EPA adjusts "the denominator—the nation's total supply of petroleum-based transportation fuel"—to exclude the volume produced by exempted refineries, that denominator will be "artificially inflated." *Sinclair Wyo.*, 101 F.4th at 881. With the denominator "inflated," applying the resulting percentage standards to nonexempt refiners and importers will not achieve the applicable renewable fuel target. *See id.*

Prior to 2020, EPA adjusted each year's percentage standard to account for any small refinery exemptions that had been granted before the Agency published that year's standard (which by statute must be done by November 30 of the preceding year). *See id.* If the Agency granted a refinery exemption before promulgating the standard, it adjusted its projection of total fuel output to exclude that refinery's

projected output. But the Agency also frequently grants exemptions *after* a percentage standard is promulgated. And EPA did not account for those so-called "retroactive exemptions." *Id.*

In 2020, EPA altered its approach. It began adjusting the percentage standards to account not only for already-granted exemptions, but also for the retroactive exemptions it expected to grant after promulgation. *See* Renewable Fuel Standard Program: Standards for 2020 and Biomass-Based Diesel Volume for 2021 and Other Changes, 85 Fed. Reg. 7,016, 7,049 (Feb. 6, 2020) (2020 Rule). EPA reasoned that it could better "ensure" achievement of the applicable volume goal for a given year if it relied on a more accurate estimate of the number of participating obligated parties and their expected total output. *See id.* at 7,050. To codify this change, EPA amended terms in the regulatory formula used to calculate the percentage standards so that the denominator reflected the exemptions the Agency "projected" would be granted in a given compliance year. *Id.*; *see* 40 C.F.R. § 80.1405(c).

Still, EPA did not go as far as some had urged. Although the new formula would largely prevent shortfalls caused by future retroactive exemptions, it did not require EPA to account for the shortfall caused by all the *past* retroactive exemptions for which the Agency had made no adjustments in prior years.

**B**

Twelve different petitions for review were promptly filed in this court challenging the 2020 Rule. As relevant here, various renewable fuel producers and trade associations argued that the Rule should be set aside because EPA also needed to account for the past retroactive exemptions. Those exemptions, they averred, translated to approximately 4.73 billion gallons of renewable fuel that should have been introduced in past years but were not. They argued that the

2020 percentage standard should be increased to make up for that past shortfall, which would in turn increase demand for renewable fuel.

But proceedings then ground to a halt—the consolidated petitions were held in abeyance for three and a half years. A primary cause of that delay was a 2022 rulemaking in which EPA revisited the 2020 Rule and the 2020 percentage standard. *See* Renewable Fuel Standard (RFS) Program: RFS Annual Rules, 87 Fed. Reg. 39,600, 39,632 (July 1, 2022) (2022 Rule). The 2022 Rule "reaffirm[ed]" the 2020 Rule's formula changes—that is, the decision to project retroactive exemptions moving forward, but not to account for past ones. *Id.* It also recalculated the 2020 compliance year standards using updated data. *Id.* at 39,633–35.

The 2022 Rule was itself challenged in this court. Certain traditional fuel refiners argued that it was unlawful for EPA to project the total number of small refinery exemptions that would be granted for a given compliance year and adjust the percentage standards accordingly. *Sinclair Wyo.*, 101 F.4th at 890–91. The two petitioners that now remain in this case— Growth Energy and Clean Fuels Alliance America— intervened to defend that feature of the 2022 Rule. Notably, those petitioners did *not* challenge the 2022 Rule for again announcing that EPA would not account for past retroactive exemptions. That case was decided in 2024, and we upheld the Rule. *Id.*

Meanwhile, the statutory framework underlying petitioners' legal challenge shifted substantially. Through 2022, the target annual renewable fuel volumes for the RFS Program were dictated by Congress in a schedule set forth at 42 U.S.C. § 7545(o)(2)(B)(i)(I). EPA's authority to "waive" that target volume was limited to circumstances of "severe[] harm [to] the economy or environment" or "inadequate

domestic supply" of renewable fuel. *Id.* § 7545(o)(7)(A). But post-2022, the statute gives EPA the authority to set the applicable volume goals. *See id.* § 7545(o)(2)(B)(ii). Under the newly operative provisions, the applicable volume for a given year "shall be determined by the [EPA] Administrator, in coordination with the Secretary of Energy and the Secretary of Agriculture, based on" certain considerations. *Id.* Those considerations include, among other things, environmental impacts, costs to consumers, and "the implementation of the [RFS] program" thus far. *Id.* We have recognized that the statute now grants EPA "considerable discretion to weigh and balance the various factors" when determining the annual volume goals. *Ctr. for Biological Diversity*, 141 F.4th at 171 (citation omitted). Further, the mandate for EPA to achieve the applicable volume goals specifically by means of percentage standards expired at the end of 2021. 42 U.S.C. § 7545(o)(3)(B)(i).

In 2024, after the challenge to the 2022 Rule was decided, this case was removed from abeyance. Most of the parties that had initially challenged the 2020 Rule voluntarily dismissed their petitions. Only Growth Energy and Clean Fuels Alliance America remain. They have abandoned their initial request that the court remand the 2020 Rule to EPA for it to recalculate and raise the 2020 percentage standards, which were superseded by the 2022 Rule. Instead, they reframe their challenge as addressing EPA's "policy" of refusing to account for past retroactive exemptions. Petitioners' Brief 1. As they explained at oral argument, petitioners no longer seek a judgment requiring EPA to "go back and change the 2020 standards . . . or any past standards." Tr. of Oral Arg. 25. Instead, their petitions are now "about changing how EPA operates in the future." *Id.*

## II

EPA argues that this case is moot, and alternatively submits that petitioners waived or forfeited their challenge to EPA's policy by not raising it in the litigation over the 2022 Rule.  Because we agree that the case is moot, we do not reach the latter question, much less the merits.

EPA's mootness argument is straightforward:  Petitioners challenged the 2020 Rule, but that Rule has been superseded by the 2022 Rule.  This argument has substantial force: Typically, when one agency action "has been superseded by a subsequent" one, a challenge to the original action is "plainly moot." *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1226 (D.C. Cir. 2021) (cleaned up).  Here, the 2022 Rule superseded the 2020 Rule by recalculating the percentage standards for calendar year 2020.  The 2022 Rule also revisited the 2020 Rule's changes to the percentage standards formula and expanded on EPA's rationale for those changes. *See* 87 Fed. Reg. at 39,632–33.  EPA was explicit that it had "chosen not to reallocate exempt volume from [small refinery exemptions] for past years," and its 2022 Rule "constitute[d]" the Agency's "final and complete response to [petitioners' 2020] petition."  J.A. 117; Tr. of Oral Arg. 8–10.

Although petitioners could have raised their same concerns regarding past retroactive exemptions in a challenge to the 2022 Rule, they did not do so.  Quite the opposite: They intervened and chose to *defend* that rule from a traditional fuel industry challenge. *See Sinclair Wyo.*, 101 F.4th at 882, 890.  What is more, petitioners argued to this court that "EPA must adjust the standards to account for all exemptions, and *its reaffirmed formula reasonably fulfills that duty*.  EPA must 'ensure' that the required volumes are met, *and adjusting the standards to reflect reasonably projected exemptions does so, even if the projection proves inaccurate*."  Biofuel

Intervenors' Brief 2, *Sinclair Wyo.*, 101 F.4th 871 (No. 22-1210) (emphasis added).

Petitioners respond that the 2022 Rule mooted only their challenge to the 2020 percentage standards, not their challenge to EPA's "policy" of refusing to account for past retroactive exemptions in its annual rulemakings. They emphasize that although the 2022 Rule revisited the 2020 Rule's amendments to the percentage standards formula, it "reaffirm[ed]" the 2020 Rule and left the formula unchanged. *See* 87 Fed. Reg. at 39,632; 40 C.F.R. § 80.1405(c). Petitioners thus argue that the court could and should declare EPA's "policy" unlawful in a way that would require EPA to account for past exemptions in its future annual rulemakings. *See, e.g.*, Reply Brief 4–5 ("If the Court agrees with petitioners, EPA will have to conform its policy to that ruling and apply its revised policy in future standard-settings . . . .").

Petitioners base this response on three of our decisions, of which *American Maritime Ass'n v. United States*, 766 F.2d 545 (D.C. Cir. 1985) is illustrative. There, the petitioners challenged an interim rule, and the agency promulgated a final rule while the case was pending. Although the final rule superseded the interim rule and the petitioners could have filed a new suit challenging that rule, we held the case was not moot. The final rule had "reaffirm[ed]" and "basically adopt[ed]" the interim rule's approach on the relevant issue, and so the petitioners' challenges were "equally applicable to the final rule and the interim rule." *Id.* at 554 n.14; *see also Union of Concerned Scientists v. Nuclear Regul. Comm'n*, 711 F.2d 370, 379 (D.C. Cir. 1983) (similar); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 459 (D.C. Cir. 1998) (finding that a challenge to agency action was not moot where portions of the regulations that informed that action were amended but others were "unaffected by [the] intervening amendments"). Petitioners here argue that because EPA continues to refuse to

account for past retroactive exemptions in its annual rulemakings, its challenge to the 2020 Rule is "equally applicable" to EPA's future rulemakings and therefore not moot under these authorities.

There may be many reasons those cases are inapposite here. But the combined force of three considerations suffices to distinguish them.

First, in each of those cases, the petitioner asked this court to set aside an identifiable past agency action. In *American Maritime*, that was the final rule that superseded the interim rule the petitioners initially challenged. This case would at least be in the same ballpark as *American Maritime* if petitioners had asked us to set aside the 2022 Rule. But they do not. Instead, they ask us to issue a purely prospective opinion to guide future agency action. Accordingly, petitioners' request sounds far closer to an impermissible request for an advisory opinion than the requests in the cases on which petitioners rely. *See Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) ("Among other salutary purposes, [mootness doctrine] protects courts from rendering impermissible advisory opinions."); *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 742 (D.C. Cir. 1988) ("It would be entirely inappropriate for this court to . . . issue an advisory opinion to guide the Secretary's rulemaking."). Indeed, the Clean Air Act provision from which our jurisdiction derives authorizes this court to "review" and "*reverse*" certain "action[s] of the Administrator." 42 U.S.C. § 7607(d)(9) (emphasis added). It is far from clear that petitioners' request—having disclaimed any effort to set aside the 2020 Rule or any other specific EPA action—fits that bill.

Second, and in marked contrast to petitioners' authorities, the legal challenge petitioners raised against the 2020 Rule is not "equally applicable" to the future rulemakings they ask us

10

to guide. Recall that EPA essentially calculates the percentage standards by dividing the annual volume target by the industry's total expected fuel output for that year. When these petitions were filed in 2020, the statute provided a numerator for that formula—30 billion gallons in 2020, 33 billion in 2021, and 36 billion in 2022. 42 U.S.C. § 7545(o)(2)(B)(i)(I). Now, however, the EPA Administrator "determine[s]" the required annual volumes based on a range of statutory considerations that includes the past "implementation of the [RFS] program," costs to consumers, and environmental considerations. *Id.* § 7545(o)(2)(B)(ii).

That change plainly affects the legal analysis petitioners ask us to conduct. Petitioners argued that EPA's duty to "ensure[]" achievement of congressionally specified targets required it to make up for past exemptions. *Id.* § 7545(o)(3)(B)(i). The crux of the parties' dispute was whether and to what extent the statute indirectly suggested EPA had a measure of discretion on that issue. But EPA's duty now is to "ensure" achievement of targets EPA itself has broad discretion to determine. The newly operative provisions are at minimum in tension with petitioners' argument that the statute implicitly requires EPA to account for past retroactive exemptions in any particular way. And that feature of the legal analysis was not presented by the 2020 Rule and thus by these petitions.

Perhaps because this case was initiated and litigated in the context of the 2020 Rule, no party has meaningfully addressed the impact of these statutory changes. But given those changes, petitioners' challenge to the 2020 Rule is not "equally applicable" to the future rulemakings they ask us to address. Even if the "policy" petitioners ask us to proscribe remained the same, the law we must apply to evaluate that alleged "policy"—the operative provisions of the RFS statute—has materially changed. Indeed, viewing the case prospectively as

petitioners request, one might say that the legal question petitioners present—whether the statute imposes a mandatory duty to account for past exemptions *under the statutory provisions in effect in 2020*—no longer exists. *Cf. People for the Ethical Treatment of Animals, Inc. v. Gittens*, 396 F.3d 416, 422–23 (D.C. Cir. 2005) (tethering mootness analysis to "the legal questions" a suit "presents for decision"); *Nat'l Mining Ass'n v. Dep't of Interior*, 251 F.3d 1007, 1011 (D.C. Cir. 2001) (holding that material revision to challenged regulations during litigation mooted aspect of case because "the new rules add[ed]" features that would "affect[] the [legal] calculus," such that the court could not proceed "as if nothing has changed").[1]

Third, as petitioners noted in an emergency motion to hold this case in abeyance filed just before oral argument, EPA is actively considering—in rulemaking for the 2026 and 2027 compliance years—whether to account for many past retroactive exemptions using its new authority to set the target fuel volume. Renewable Fuel Standard (RFS) Program: Standards for 2026 and 2027, Partial Waiver of 2025 Cellulosic Biofuel Volume Requirement, and Other Changes; Supplemental Notice of Proposed Rulemaking, 90 Fed. Reg. 45,007, 45,007 (Sept. 18, 2025) (proposing a "reallocation," in full or in part, of volumes associated with 2023 and 2024 exemptions). That action is not yet finalized and may itself be challenged in litigation. But EPA's proposal raises doubts that EPA will even continue following the "policy" from the 2020 Rule that petitioners ask us to review. *See* Mot. for Abeyance 1 (Sep. 22, 2025) ("These actions endorse the programmatic

---

[1] Further, although EPA has so far chosen to continue using the formula codified at 40 C.F.R. § 80.1405(c) to impose percentage standards on obligated parties, EPA is no longer required to issue percentage standards at all. *See* 42 U.S.C. § 7545(o)(3)(B)(i).

logic underlying petitioners' claim here . . . ."). Just as in *Alaska*, the need to "speculate about future actions by policymakers" undermines our jurisdiction. 17 F.4th at 1229.[2]

Our rationale is narrow. Petitioners ask us to opine on the propriety of a supposed agency "policy" disconnected from any particular agency action, when the operative statutory provisions have changed mid-litigation in ways that bear directly on the legal question petitioners raised, and when it is not clear the agency even adheres to the same policy petitioners initially challenged. None of the authorities they have identified involved remotely analogous circumstances. We accordingly conclude that the default mootness rule for superseded agency action governs.

This ruling of course does not prohibit petitioners from presenting a version of their legal challenge to EPA in the concrete setting of a specific future annual rulemaking. If petitioners do so, then EPA and, if necessary, a reviewing court, could assess that argument in the context of the statute as it operates today.

## III

The petitions for review are dismissed as moot.

*So ordered.*

---

[2] Petitioners might have invoked our caselaw finding that challenges are not moot when a party seeks declaratory relief from an "ongoing policy," as opposed to or in addition to relief targeting a particular agency action. *See Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 143 F.4th 518, 530–31 (D.C. Cir. 2025). But we have similarly never applied that mootness exception where, as here, the relevant legal landscape has materially changed, much less when it is unclear whether the agency even has an "ongoing policy" in the relevant sense.