KATSAS, Circuit Judge, dissenting:
 

 Gordon Reid alleges that the Federal Bureau of Prisons has adopted a nationwide policy to violate its own regulations regarding the treatment of prisoners. My colleagues reserve the question whether Reid has adequately alleged such a policy. Yet, in assessing mootness, they credit the allegation for now and then use it to transform specific past disputes-about Reid's treatment in prisons where he is no longer housed-into a unified, recurring controversy that may follow Reid from prison to prison.
 

 Respectfully, I am unpersuaded. We should reject Reid's conclusory allegation that BOP has implemented unlawful nationwide policies. And without such unifying policies, the specific disputes alleged here are not capable of repetition. Therefore, I would affirm the dismissal of this case as moot.
 

 I
 

 In 2008, Reid was convicted of robbing a convenience store. During pretrial detention, "Reid quickly distinguished himself as a combative, disruptive, and violent inmate."
 
 Reid v. Strafford Cty. Dep't of Corr.
 
 , No. 06-CV-182,
 
 2008 WL 163042
 
 , at *1 (D.N.H. Jan. 15, 2008). Since then, while incarcerated at various BOP facilities, Reid has amassed a disciplinary record that includes assault with a dangerous weapon, fighting and threatening other prisoners, throwing liquids on prison guards, indecent exposure, disobeying orders, and insolence. J.A. 20-30. Reid has often been placed in the Special Housing Unit (SHU) of various prisons, for either disciplinary or administrative reasons.
 

 In March 2015, Reid filed a lawsuit arising from his treatment in the SHUs of prisons in Arizona, California, Indiana, Kentucky, Louisiana, North Carolina, Oklahoma, and Virginia. Reid alleged that he was denied magazines and exercise pursuant to informal BOP policy and that he was often denied prompt access to administrative complaint forms. Reid claimed that these various deprivations violated BOP regulations and a formal policy statement. He sought declaratory and injunctive relief, but not damages.
 

 After the complaint was filed, Reid was transferred to a prison in Florida and then to another prison in Pennsylvania. Reid has never sought to amend his complaint to add allegations about his treatment at either of those institutions.
 

 The government moved to dismiss or for summary judgment on various grounds, including mootness. Reid cross-moved for summary judgment. In these motions, both parties introduced documents and affidavits detailing Reid's past treatment at BOP prisons.
 

 The district court dismissed the case as moot. It invoked our precedents holding that an inmate's release or transfer from a prison normally moots prospective challenges to conditions at that prison.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Scott v. District of Columbia
 
 ,
 
 139 F.3d 940
 
 , 941 (D.C. Cir. 1998). This rule is merely one specific application of the general mootness principle: "A case becomes moot-and therefore no longer a 'Case' or 'Controversy' for purposes of Article III-when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."
 
 Already, LLC v. Nike, Inc.
 
 ,
 
 568 U.S. 85
 
 , 91,
 
 133 S.Ct. 721
 
 ,
 
 184 L.Ed.2d 553
 
 (2013) (quotation marks omitted).
 

 II
 

 In support of Reid, a court-appointed amicus advances two distinct arguments to avoid mootness. One argument is that this case never became moot because Reid seeks to challenge not only specific past deprivations, but also an ongoing policy to inflict similar deprivations at all BOP prisons. Another argument is that this case falls within an exception to mootness because the past deprivations involve controversies that are capable of repetition yet evading review.
 
 [1]
 

 My colleagues credit the second argument, at least in the current procedural posture of this case, and they do not reach the first argument. I would reject both. I begin with the policy point because, as explained below, unless Reid can plead and prove that BOP has a nationwide policy to violate the regulations at issue in this case,
 he cannot show that his specific past disputes are capable of repetition.
 

 A
 

 The complaint frames a challenge to ongoing policies. Reid alleges a "BOP policy" that "prisoners housed in SHU may not have magazines," in violation of a regulation providing that they may. J.A. 7. Likewise, Reid alleges a "BOP policy" to restrict inmates' exercise as punishment for minor infractions of prison rules, in violation of a written policy statement that "[r]estriction or denial of exercise is not used as punishment." J.A. 8-9. Finally, Reid alleges that, "[o]n many occasions," he was denied prompt access to forms for filing grievances. J.A. 9. Reid does not further describe these alleged policies. Yet his amicus contends that this case presents justiciable challenges to all of them.
 

 1
 

 If "the specific conduct that gave rise to the case has ceased," a plaintiff nonetheless may seek prospective relief "as to an ongoing policy" authorizing the conduct.
 
 Del Monte Fresh Produce Co. v. United States
 
 ,
 
 570 F.3d 316
 
 , 321 (D.C. Cir. 2009). But the plaintiff must establish both that he "has standing to bring such a forward-looking challenge" and that "the [challenge] is ripe."
 
 City of Houston v. HUD
 
 ,
 
 24 F.3d 1421
 
 , 1429 (D.C. Cir. 1994). Standing requires an injury that is "concrete, particularized, and actual or imminent," among other things.
 
 Clapper v. Amnesty Int'l USA
 
 ,
 
 568 U.S. 398
 
 , 409,
 
 133 S.Ct. 1138
 
 ,
 
 185 L.Ed.2d 264
 
 (2013) (quotation marks omitted). Ripeness requires both an impending injury and an issue that is presently fit for judicial resolution.
 
 See
 

 Texas v. United States
 
 ,
 
 523 U.S. 296
 
 , 300-01,
 
 118 S.Ct. 1257
 
 ,
 
 140 L.Ed.2d 406
 
 (1998). Without pleading and proving that an ongoing policy exists, the plaintiff cannot satisfy these basic requirements, and the prospective challenge likewise would fail on the merits.
 

 Standing and ripeness must be "supported in the same way as any other matter on which the plaintiff bears the burden of proof,
 
 i.e.
 
 , with the manner and degree of evidence required at the successive stages of the litigation."
 
 Lujan v. Defenders of Wildlife
 
 ,
 
 504 U.S. 555
 
 , 561,
 
 112 S.Ct. 2130
 
 ,
 
 119 L.Ed.2d 351
 
 (1992). Thus, on a motion to dismiss, the plaintiff must allege well-pleaded facts that support a plausible inference of standing and ripeness.
 
 See
 

 Ashcroft v. Iqbal
 
 ,
 
 556 U.S. 662
 
 , 677-84,
 
 129 S.Ct. 1937
 
 ,
 
 173 L.Ed.2d 868
 
 (2009) ;
 
 Bell Atl. Corp. v. Twombly
 
 ,
 
 550 U.S. 544
 
 , 555-63,
 
 127 S.Ct. 1955
 
 ,
 
 167 L.Ed.2d 929
 
 (2007). Confirming this point, we have held that the pleading requirements of
 
 Twombly
 
 and
 
 Iqbal
 
 apply to questions of standing.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Hancock v. Urban Outfitters, Inc.
 
 ,
 
 830 F.3d 511
 
 , 513 (D.C. Cir. 2016) (at the pleading stage, a plaintiff must " 'state[ ] a plausible claim' that each element of standing is satisfied" (quoting
 
 Iqbal
 
 ,
 
 556 U.S. at 678-79
 
 ,
 
 129 S.Ct. 1937
 
 ) ). Likewise, on summary judgment, the plaintiff must adduce sufficient evidence from which the trier of fact could reasonably find standing and ripeness.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Anderson v. Liberty Lobby, Inc.
 
 ,
 
 477 U.S. 242
 
 , 248-52,
 
 106 S.Ct. 2505
 
 ,
 
 91 L.Ed.2d 202
 
 (1986).
 

 Two aspects of
 
 Twombly
 
 and
 
 Iqbal
 
 are important here. First, courts do not accept as true a complaint's legal conclusions, "mere conclusory statements," or "[t]hreadbare recitals of the elements" of a claim.
 
 Iqbal
 
 ,
 
 556 U.S. at 678
 
 ,
 
 129 S.Ct. 1937
 
 . Included in these categories are naked assertions of unlawful motive,
 
 see
 

 id.
 

 at 680-82
 
 ,
 
 129 S.Ct. 1937
 
 , or agreement,
 
 see
 

 Twombly
 
 ,
 
 550 U.S. at 551
 
 ,
 
 127 S.Ct. 1955
 
 . Second, any specific factual allegations falling outside these categories must establish a "plausible" claim-something
 "more than a sheer possibility that a defendant has acted unlawfully."
 
 Iqbal
 
 ,
 
 556 U.S. at 678
 
 ,
 
 129 S.Ct. 1937
 
 . For example, "parallel conduct does not suggest conspiracy" in antitrust cases, for it is fully consistent with independent action in competitive markets.
 
 Twombly
 
 ,
 
 550 U.S. at 557, 566-70
 
 ,
 
 127 S.Ct. 1955
 
 . Likewise, the fact that "thousands of Arab Muslim men" were detained after the September 11 attacks was "no surprise" given the identities of the attackers, and thus did not support a plausible inference of unconstitutional discrimination.
 
 Iqbal
 
 ,
 
 556 U.S. at 681-82
 
 ,
 
 129 S.Ct. 1937
 
 . In both instances, the allegations failed to negate an "obvious alternative explanation" besides unlawful conduct.
 

 Id.
 

 at 682
 
 ,
 
 129 S.Ct. 1937
 
 (quoting
 
 Twombly
 
 ,
 
 550 U.S. at 567
 
 ,
 
 127 S.Ct. 1955
 
 ).
 

 2
 

 Under these standards, Reid failed to plausibly allege any unlawful BOP policies. To begin, it is not enough merely to assert that unlawful policies exist, just as it was not enough merely to assert the existence of a conspiracy in
 
 Twombly
 
 or an illicit motive in
 
 Iqbal
 
 . Rather, the bare allegation of an unlawful policy is a legal conclusion or conclusory statement.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 AE ex rel. Hernandez v. Cty. of Tulare
 
 ,
 
 666 F.3d 631
 
 , 637 (9th Cir. 2012) ;
 
 McCauley v. City of Chicago
 
 ,
 
 671 F.3d 611
 
 , 616-17 (7th Cir. 2011). Even two decades before
 
 Twombly
 
 , this Court made clear that "more than a nebulous assertion of the existence of a 'policy' is required to establish standing."
 
 Haase v. Sessions
 
 ,
 
 835 F.2d 902
 
 , 911 (D.C. Cir. 1987). Thus, the allegation that Reid was denied magazines and exercise "per BOP policy," J.A. 7-8, is plainly insufficient. And the statement that Reid was denied prompt access to administrative forms "[o]n many occasions," J.A. 9, is even less substantial, as it fails to allege a policy even in conclusory terms.
 

 The complaint further alleges that prison officials "invariably informed" Reid that they were following BOP policies in denying him magazines and exercise. J.A. 7-8. Yet Reid says nothing more about who said so, when, where, how often, and under what circumstances. This too falls short, for
 
 Twombly
 
 and
 
 Iqbal
 
 require enough "specific facts" to "present a story that holds together."
 
 McCauley
 
 ,
 
 671 F.3d at 616
 
 (quotation marks omitted). These vague references to hearsay statements tell no such story. If pleading "there is a policy" is not enough, then neither is pleading "I was invariably informed that there is a policy," which is all Reid has done here.
 

 Nor do Reid's allegations about specific incidents support any plausible inference of a policy. As for magazines, the complaint alleges only that, at eight facilities, "prison officials refused to deliver magazines sent from the publisher to Petitioner." J.A. 7. Entirely unstated are the involved officials; the names, number, or types of the magazines; and the frequency or surrounding circumstances of any refusal to deliver. As for exercise, Reid alleges only denials for infractions "such as having a string hanging from the shower, a piece of paper in the window, not having his bed made to the satisfaction of the prison guard, or any other matter of cell decorum, whether real or imagined." J.A. 8. On its face, this suggests not a nationwide policy, but individual decisions based on the facts and circumstances surrounding different prisoners in different prisons at different times.
 

 The relevant BOP regulations further undercut any inference of an illicit nationwide policy. They permit inmates to "receive softcover publications" such as magazines,
 
 28 C.F.R. § 540.71
 
 (a)(1), but this privilege is limited in several respects. For one, a warden may reject publications
 deemed "detrimental to the security, good order, or discipline" of the prison, as well as publications that "might facilitate criminal activity."
 

 Id.
 

 § 540.71(b). A warden also "may set limits locally (for fire, sanitation or housekeeping reasons) on the number or volume of publications an inmate may receive or retain in his quarters."
 

 Id.
 

 § 540.71(f). Finally, a warden may restrict an inmate's incoming correspondence "based on misconduct or as a matter of classification."
 

 Id.
 

 § 540.15(a). The regulations further provide that a SHU inmate may receive five hours of outdoor exercise per week,
 

 id.
 

 § 541.31(g), and a BOP policy document states that "[r]estriction or denial of exercise is not used as punishment," BOP Program Statement 5270.11, at 12 (Nov. 23, 2016). But this privilege is also significantly limited, as the regulation further states that exercise may be denied "if it is determined that [the inmate's] use of exercise privileges threatens safety, security, and orderly operation of a correctional facility, or public safety."
 
 28 C.F.R. § 541.31
 
 (g). Reid does not challenge any of these limitations.
 

 Given the narrow, qualified nature of these regulatory privileges, a large number of deprivations does not plausibly suggest illegal nationwide policies. Any such inference would ignore an obvious alternative explanation-that the deprivations resulted from individual applications of the regulations to the circumstances of different prisoners in different prisons at different times. The regulations themselves require such contextual judgments, and Reid's allegations provide no basis to suspect anything more sinister.
 

 3
 

 Reid's thin allegations of amorphous policies also fail to establish ripeness. In
 
 Worth v. Jackson
 
 ,
 
 451 F.3d 854
 
 (D.C. Cir. 2006), we held unripe a prospective challenge to an alleged informal policy of using race and sex preferences in hiring. As we explained, "we cannot assess a facial challenge to an unwritten policy that by definition has no face."
 

 Id.
 

 at 862
 
 . We concluded that, absent "concrete application" of the policy, we could not "ascertain its contours."
 

 Id.
 

 In
 
 City of Houston
 
 , we likewise held unripe a prospective challenge to an alleged informal policy to deny hearings in vaguely specified categories of cases.
 
 24 F.3d at 1431
 
 ("There is simply no way for this court to consider whether HUD can act without a hearing in some amorphous category of 'cases such as this one,' because the actual contours of the cases within the category are potentially determinative of their outcome."). Here, Reid's complaint similarly alleges an unwritten policy that is uncertain in its scope and application.
 

 On this point, the amicus invokes
 
 Payne Enterprises v. United States
 
 ,
 
 837 F.2d 486
 
 (D.C. Cir. 1988), which adjudicated a prospective challenge to an Air Force policy of refusing to release bid abstracts for certain contracts.
 

 Id.
 

 at 488
 
 . But the policy there was written, its scope was undisputed, and its application in future cases did not depend on presently unknown facts.
 
 See
 

 id.
 

 at 491
 
 . None of that is true here.
 

 4
 

 The evidentiary submissions undercut Reid's policy claim even further. Both parties moved for summary judgment and, in so doing, introduced documents and affidavits detailing Reid's various disputes with BOP. Reid opposed the government's motion on the merits but did not argue that it was premature. Thus, pleadings aside, we could readily reject the alleged illegal policy on summary judgment.
 

 The evidentiary materials confirm that Reid's past disputes with BOP have been localized and fact-intensive. To pick a few
 examples: Documents indicate that in September 2013, officials at the Jonesville, Virginia prison withheld magazines from Reid because of security concerns about "inmates continuously covering their cell windows and light fixtures, which causes poor visibility into cells and interferes with staff duties."
 
 Reid v. Samuels
 
 , No. 15-CV-375 (D.D.C.), ECF Doc. 23, at 66. In January 2013, officials at the Atwater, California prison made a different, safety-related judgment-to withhold magazines from Reid because of concerns about sanitation and fire hazards.
 
 See
 

 id.
 
 at 18. By contrast, an official at the Tucson, Arizona prison where Reid was held from November 2013 to July 2015 testified that inmates there were "not denied access to their mail," and Reid had neither bought nor been sent any magazines. J.A. 49. The disputes about exercise were similarly varied: Atwater officials revoked Reid's privileges after he obstructed the light fixture in his cell.
 
 Reid
 
 , No. 15-CV-375, ECF Doc. 23, at 32. According to Reid, officials at other prisons did the same after he put "paper on the wall, light, sink, etc." J.A. 68. A Tucson official testified that Reid was not denied exercise but voluntarily refused it. J.A. 50.
 

 To be sure, Reid disputes much of this evidence. For example, he argues that magazines should not have been "singled out" for removal in Jonesville because other objects could have been used to cover lights and windows.
 
 Reid
 
 , No. 15-CV-375, ECF Doc. 23, at 68. He claims that, while in Tucson, he was given a free subscription to "Z Magazine" and never refused exercise. J.A. 69-70. He contends that a cellmate obstructed the light in Atwater.
 
 Reid
 
 , No. 15-CV-375, ECF Doc. 23, at 34. Whatever the merits of these disputes, they turn on particular facts involving individual prisons and prisoners. Neither the disputes themselves, nor any other record evidence, suggest illegal nationwide policies.
 

 B
 

 Without any policy that could unify Reid's various individual disputes with BOP, this action cannot fit within the mootness exception for cases that are capable of repetition yet evading review. Under that doctrine, there must be a reasonable expectation that the same "legal controversy" between the same parties will reoccur.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Del Monte
 
 ,
 
 570 F.3d at 322-24
 
 . Only then can the doctrine be squared with "the Constitution's requirement, set forth in Article III, that courts resolve only continuing controversies between the parties."
 
 People for the Ethical Treatment of Animals v. Gittens
 
 ,
 
 396 F.3d 416
 
 , 422 (D.C. Cir. 2005) (
 
 PETA
 
 ).
 

 Our decisions confirm that, to be capable of repetition, a legal controversy must be fixed, knowable in advance, and thus predictably repeatable. For example, in
 
 Del Monte
 
 , we held that a dispute whether certain statutory deadlines were mandatory was capable of repetition.
 
 570 F.3d at 324-35
 
 . Likewise, in
 
 Christian Knights of the Ku Klux Klan v. District of Columbia
 
 ,
 
 972 F.2d 365
 
 (D.C. Cir. 1992), we held capable of repetition a dispute whether a permit to march along the National Mall could be restricted because of threatened audience violence.
 

 Id.
 

 at 371
 
 . By contrast, in
 
 PETA
 
 , we held that a past controversy, which arose from the exclusion of a sculpture from an exhibit, was too "fact-specific" to be capable of repetition.
 
 396 F.3d at 424
 
 . The plaintiff alleged impermissible content discrimination in how the formal selection criteria had been applied in practice.
 
 See
 

 id.
 

 at 423
 
 . After summarizing the various factual disputes embedded in the controversy, we stated: "To conclude that a dispute like this would arise in the future requires us to imagine a sequence of coincidences too long to credit."
 

 Id.
 

 at 424
 
 .
 

 PETA
 
 governs this case. Setting aside the deficient policy allegations, Reid does not challenge anything that could give rise to a discrete, predictably repeatable legal controversy. As explained above, he claims that BOP has violated regulations that require case-by-case inquiries into prison safety, security, order, discipline, sanitation, and housekeeping. Not surprisingly, the application of those regulations has spawned distinct, fact-intensive controversies. For example, the Jonesville dispute about the use of magazines as window covers is different from the Atwater dispute about sanitation and fire hazards, and both of those are different from the Tucson dispute about what magazines were mailed to Reid. Likewise, the Tucson dispute about whether Reid refused exercise is different from the Atwater dispute about which inmate obstructed the lights, and both of those are different from other disputes about whether Reid adequately maintained his cell. Because no discrete, identifiable legal controversy is capable of repetition, the mootness exception does not apply.
 

 C
 

 My colleagues reverse on narrow grounds, so my disagreement with them is also narrow. They reserve the question whether Reid has adequately pleaded a policy under the plausibility standard articulated in
 
 Twombly
 
 and
 
 Iqbal
 
 .
 
 Ante
 
 at 834-35. Likewise, they reserve the question whether Reid's policy allegations could survive a motion for summary judgment.
 
 Ante
 
 at 835. I would have decided those questions, but they remain open on remand.
 

 The disagreement about how to apply the mootness exception for cases that are capable of repetition yet evading review is also narrow. My colleagues do not dispute two critical points: the legal controversy itself must be predictably repeatable, and Reid's claim to satisfy this requirement depends on his policy allegations. My colleagues invite the district court on remand to probe the facts relevant to mootness-including the policy allegations-either on a motion to dismiss or on summary judgment.
 
 Ante
 
 at 834-35. So, the mootness question also remains open.
 

 Ultimately, my colleagues and I disagree over how to apply the mootness exception in the current procedural posture of this case, which they describe as one involving a "motion to dismiss the Complaint at the pleadings stage."
 
 Ante
 
 at 833. My colleagues recognize that the party opposing mootness bears the burden of proving that the exception applies.
 
 Ante
 
 at 832-33. But they note that a complaint, which is filed before the alleged mooting event, obviously cannot plead a mootness exception.
 
 Ante
 
 at 833. So, they conclude, we should consider only whether there is any "logical deficiency" in the plaintiff's argument for satisfying the exception.
 
 Ante
 
 at 833-35. They derive this forgiving standard from a statement in
 
 Haase
 
 that "[a]ssuming the theory presented in the complaint is not itself inherently flawed, the standing inquiry is ordinarily now complete."
 
 835 F.2d at
 
 907 ;
 
 see
 

 ante
 
 at 832-33.
 

 This analysis seems to me mistaken. For one thing,
 
 Haase
 
 was a case about initial standing, so it has nothing to say about how courts should assess intervening facts bearing on mootness. Its inquiry whether the plaintiff's theory is "inherently flawed" reflects not a distinction between standing and mootness, but a general premise that motions to dismiss do not test for pleading sufficiency. That premise was correct when
 
 Haase
 
 was decided in 1987,
 
 see
 

 Conley v. Gibson
 
 ,
 
 355 U.S. 41
 
 ,
 
 78 S.Ct. 99
 
 ,
 
 2 L.Ed.2d 80
 
 (1957), but it did not survive
 
 Twombly
 
 and
 
 Iqbal
 
 .
 

 In this case, the complaint alleges illicit policies that pre-date the mooting event of Reid's prison transfer, so there is nothing unfair about assessing whether those allegations were plausibly pleaded. And, if intervening factual developments had strengthened Reid's case, he could have sought leave to amend the complaint, which he did not. Finally, the record includes not only the government's motion to dismiss, but also the parties' cross-motions for summary judgment, which amply develop the facts relevant to mootness. As noted above, Reid has never claimed that the government's motion was premature. So, I can see no reason to apply only a minimal screen for "logical deficiency" at this juncture, thereby artificially prolonging the life of this moot case.
 

 Because nothing prevents us from resolving the question of mootness now, I would affirm the district court's order dismissing this case as moot.
 

 Reid has forfeited any argument based on the voluntary-cessation exception to mootness.
 
 Ante
 
 at 833 n.4.